DONALD L. NORDLING AND OTHERS v. FORD MOTOR COMPANY.[1]

April 28, 1950.

No. 35,101.

[1]Reported in 42 N. W. (2d) 576.

*Doherty, Rumble, Butler & Mitchell,* for relator.

*Douglas Hall,* for respondents.

*J. A. A. Burnquist,* Attorney General, *K. D. Stalland,* Assistant Attorney General, and *George W. Olson,* for Director of Division of Employment and Security.

KNUTSON, JUSTICE.

Certiorari to review a decision of the director of the division of employment and security.

The Ford Motor Company is a Delaware corporation having its principal office and manufacturing plants at Dearborn, Michigan. Its so-called Rouge plant, in which many of the parts of its Ford, Mercury, and Lincoln automobiles are manufactured, is located at Dearborn. One of the buildings located at the Rouge plant is known as B building, which is used and operated solely for assembling Ford and Mercury automobiles. Another assembly plant is located in St. Paul, and several others are scattered throughout the United States. The St. Paul plant is conducted primarily to assemble Ford automobiles and trucks. In addition, it produces power at its hydroelectric station, selling what it does not use to the Northern States Power Company. It operates a glass factory in which plate glass is manufactured, which is then shipped to

Dearborn for lamination into safety glass commonly used in automobiles. It also operates a service or parts division, which furnishes parts and accessories to dealers in Minnesota, North Dakota, South Dakota, and parts of Montana, Wisconsin, and Iowa.

All assembly plants of the Ford Motor Company operate by a continuous conveyor or assembly system. Between the 10th and 15th of each month, the control department at Dearborn determines the production schedule for the St. Paul plant, which includes the total number of vehicles by types which are to be produced during the month and also the number to be produced daily. Between 3,800 and 4,000 separate items are required to assemble a Ford passenger car or truck. Of these, about 900 parts come from the Rouge plant, and the balance of the items come from outside vendors, including units of the Ford Motor Company other than the Rouge plant. All parts are either purchased or manufactured by or at the direction of the production department at Dearborn. The only purchases made by the St. Paul plant are gasoline, oils, and greases. Included within the list of parts produced at the Rouge plant are most of the major component parts necessary to assemble an automobile or truck, such as parts of the body, motors, axles, drive shafts, chassis, etc. No parts are manufactured at the St. Paul plant, and without parts from the Rouge plant the St. Paul plant could not continue to operate longer than such period of time as to exhaust all parts then on hand. Many of the parts manufactured at the Rouge plant could not be obtained from outside vendors without the expenditure of large sums of money for tools, dies, jigs, and fixtures, which it would take months or years to acquire.

Parts produced at the Rouge plant are shipped to St. Paul by freight, truck, mail, and occasionally by air. The normal transit time between Dearborn and St. Paul is four days. The St. Paul plant attempts to keep on hand enough parts to operate four or five days. The production department at Dearborn keeps in constant touch with the St. Paul plant by telephone, teletype, and wire.

All money received from the sale of assembled vehicles is deposited by the St. Paul comptroller in the Northwestern National Bank of Minneapolis to "Treasurer's Account Ford Motor Company." The St. Paul branch has no control over withdrawals from this account. Operating expenses are sent weekly by the Dearborn office to the First National Bank of St. Paul, and the resident comptroller draws on this account to pay local wages and other operating expenses. The employment representative at St. Paul has charge of hiring and placement, as well as termination and separation of employes at that branch. After the production schedule for the month has been determined at Dearborn, the St. Paul branch determines how many employes it needs for that period. Layoffs and recalls are based on seniority rights, and questions relating to seniority are determined by conference between Local 879 and the St. Paul office.

The employes of the St. Paul branch are members of Local 879. The employes at the Rouge plant working on Ford automobiles and trucks are members of Local 600, and Lincoln-Mercury employes at the Rouge plant and at Detroit are members of Local 900. All three are locals of International Union, United Automobile, Aircraft, and Agricultural Implement Workers of America, hereinafter called UAW, which is a member of the Congress of Industrial Workers, hereinafter called CIO.

All employes of the various branches and plants of the Ford Motor Company operate under one master union contract. This contract provides for a union shop under which membership in the union is a prerequisite to employment. Loss of membership results in discharge. Under the contract, the company recognizes UAW-CIO as the exclusive collective bargaining agent of employes of the company in the United States.

During the early part of May 1949, a dispute arose between the company and the union regarding an alleged speed-up of the conveyor system in B building at the Rouge plant. The company and the union failed to agree on a settlement. At noon on May 5, 1949, all employes at the Rouge and Lincoln plants in Dearborn went on strike. They were all members of either Local 600 or Local 900,

UAW-CIO. Following the strike, the St. Paul branch continued to operate as long as it had parts, but on May 10, 1949, it was forced to close down because of lack of parts produced by the Rouge plant. The strike continued until May 29, on which date a settlement was reached, and the Rouge plant began operating on May 31. The St. Paul plant remained closed until June 8, 1949, because it lacked essential parts, which could not be supplied until that date.

It is conceded that no dispute existed between the union and the company so far as operations at the St. Paul plant were concerned. The entire dispute was confined to operations at B building of the Rouge plant. Had the strike been confined to B building, there would have been no shutdown at St. Paul. After the commencement of the strike, the company offered to permit all plants to continue to operate, except that affected by the strike, until the dispute could be settled, but the union refused to accept this offer.

The strike was called by virtue of an affirmative vote of Local 600 and Local 900. A strike must be authorized by UAW, but the decision to strike is made by the Local. Local 879 at St. Paul had no voice in determining whether or not to strike. Nothing that Local 879 could do would have averted the strike.

During the entire strike the glass plant at St. Paul continued to operate. So did the parts division and some of the maintenance crew. Under the contract between the union and the company, employes having greater seniority rights have a right to "bump" others having less rights in case of layoffs. Many of those employed in divisions which were affected by the shutdown did "bump" others having less rights in the departments which continued to operate. Questions relating to seniority and replacements were settled by conference with union representatives.

Subsequent to the shutdown at the St. Paul plant, respondents and other employes filed claims for unemployment compensation benefits. In view of the large number of claims involved, the director of the division of employment and security referred the claims directly to an appeal tribunal for hearing and determination in accordance with M. S. A. 268.10, subd. 2. The appeal tribunal

allowed the claims. On appeal to the director, the decision was affirmed. The matter comes here on certiorari to review the decision of the director.

Determination of the issues involved requires an interpretation of § 268.09, subd. 1(6).

Our original unemployment compensation statute, which came into existence by virtue of Ex. Sess. L. 1936, c. 2, was based on a draft proposed by the federal Social Security Board for adoption by the states.[2] Section 7(2)(d) of our act, disqualifying employes on account of unemployment due to a stoppage of work which exists because of a labor dispute, read as follows:

"An individual shall be disqualified for benefits—

\* \* \* \* \*

"(d) For any week with respect to which the commission finds that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed: Provided that this subsection shall not apply if it is shown to the satisfaction of the commission that—

"(1) He is not participating in or financing the labor dispute which caused the stoppage of work; and

"(2) He does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing the dispute; and provided further, that if in any case separate branches of work, which are commonly conducted as separate businesses in separate premises, are conducted in separate departments of the same premises, each such department shall for the purposes of this subsection be deemed to be a separate factory, establishment, or other premises."

Similar provisions are contained in the acts of all states but nine. 33 Minn. L. Rev. 760. Our act was amended by L. 1943, c. 650, so

---

[2] Draft Bills for State Unemployment Compensation of Pooled Fund and Employer Reserve Account Types, prepared by the federal Social Security Board September 1936, § 5(d), p. 13.

that the disqualifying provision now reads (L. 1943, c. 650, § 5 [M. S. A. 268.09, subd. 1(6)]):

"If such individual has left or partially or totally lost his employment with an employer because of a strike or other labor dispute. Such disqualification shall prevail for each week during which such strike or other labor dispute is in progress at the establishment in which he is or was employed, except that this disqualification shall not act to deny any individual the right to benefits based on employment subsequent to his separation because of a strike or other labor dispute if such an individual has in writing notified the employer involved in such strike or other labor dispute of his resignation and acceptance of his resignation and acceptance of other bona fide employment and provided further that such resignation is accepted by all parties to the strike or other labor dispute so that such individual is not longer considered an employee of such employer. For the purpose of this section the term 'labor dispute' shall have the same definition as provided in the Minnesota Labor Relations Act.[3] Nothing in this subsection shall be deemed to deny benefits to any employee who becomes unemployed because of a lockout or by dismissal during the period of negotiation in any labor dispute and prior to the commencement of a strike."

Minnesota is now one of nine states providing for a blanket disqualification in which the question of participation, financing, or interest in the strike or labor dispute has no further bearing upon the question of disqualification. 33 Minn. L. Rev. 763; Bucko v. J. F. Quest Foundry Co. 229 Minn. 131, 38 N. W. (2d) 223.

To give effect to the first and the following sentence of the dis-

---

[3]The definition of "labor dispute" in our labor relations act (§ 179.01, subd. 7), as adopted by reference in § 268.09, is as follows:

" 'Labor dispute' includes any controversy concerning employment, tenure or conditions or terms of employment or concerning the association or right of representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms, tenure, or other conditions of employment, regardless of whether or not the relationship of employer and employee exists as to the disputants."

qualifying provision of § 268.09, subd. 1(6), the first sentence thereof must be construed to have the same meaning as if it read: "If such individual has left or partially or totally lost his employment with an employer because of a strike or other labor dispute at the establishment in which he is or was employed."

When so read, the question raised by this review is: What definition shall be given to the words "because of a strike or other labor dispute at the *establishment* in which he is or was employed"?

Relator contends that the entire Ford Motor Company is one establishment; hence, when the strike at the Rouge plant resulted in a shortage of parts which in time caused the shutdown of the St. Paul plant, the resulting unemployment was due to a strike or other labor dispute at the establishment in which the employes of the St. Paul plant were employed, and, consequently, they are disqualified from benefits.

Respondents, on the other hand, contend that the St. Paul plant is a separate establishment; that there was no strike or other labor dispute in progress at the St. Paul plant; hence that they were not disqualified.

Relator further contends that under our act compensation is provided for those who are unemployed through no fault of their own; that, inasmuch as the members of Local 879 are members of UAW-CIO, as are the members of Local 600 and Local 900, and the international union is the bargaining agent for all Ford employes, the employes of the St. Paul branch must be held responsible for the acts of their agents in calling the strike at the Rouge plant; and that, consequently, when the strike at the Rouge plant eventually resulted in a shutdown at St. Paul, the unemployment of the St. Paul workers was voluntary in the sense that they, through their agents, were responsible for the strike, and that therefore they cannot recover unemployment benefits. In other words, relator contends that the unemployment of respondents is directly attributable to the action of their union in authorizing and approving the shutdown of the entire Rouge plant; that the union was the responsible agent of respondents; and that respondents' unemployment having

been caused by the action of their agent they cannot be compensated for such unemployment under the Minnesota act. Relator also argues that, inasmuch as Local 879, Local 600, and Local 900 are all members of UAW-CIO and all operate under one master contract, Local 879 will benefit from the strike, as well as the locals actually on strike, and that therefore it must be held to be responsible for the strike.

We considered some of the elements of our disqualifying clause in Bucko v. J. F. Quest Foundry Co. 229 Minn. 131, 38 N. W. (2d) 223. We need not reconsider them here.

We believe that the question involved in this case is a very narrow one. A determination of what is meant in our statute by the term "establishment" will be decisive of the issues now before us, regardless of whether the employes will share in the benefits of the strike if the union wins or not and regardless of whether the same international union represents all Ford employes.

It is true that our act contemplates compensation for those who are unemployed because of no fault of their own. However, where there is an express provision for disqualification, the facts must come within the meaning of the words used by the legislature if the disqualification is to be effective. The disqualification which we have under consideration relates to unemployment due to a labor dispute, and it is clear that before such labor dispute can effectively disqualify it must be in progress at the *establishment at which the claimant is or was employed.* The mere fact that the employes are represented by the same agent will not suffice to disqualify if the strike or labor dispute causing the unemployment is not in progress at the establishment at which the claimant was or is employed.

Unemployment compensation statutes were enacted during a period of distress and were designed to relieve the hardship caused by unemployment due to no fault of the employe. The legislative purpose behind the enactment of our act is to be found in the legislative declaration of public policy, § 268.03.[4] It is a general rule

---

[4]"As a guide to the interpretation and application of sections 268.03 to 268.24, the public policy of this state is declared to be as follows: Economic

that a liberal construction is usually accorded statutes which are regarded by courts as humanitarian or which are grounded on a humane public policy. 50 Am. Jur., Statutes, § 396; A. H. Phillips, Inc. v. Walling, 324 U. S. 490, 65 S. Ct. 807, 89 L. ed. 1095, 157 A. L. R. 876; Aragon v. Unemployment Compensation Comm. (9 Cir.) 149 F. (2d) 447; Tennessee C. I. & R. Co. v. Martin, 251 Ala. 153, 36 So. (2d) 547. Where there are disqualifying provisions, the exceptions should be narrowly construed. But these rules of construction do not mean that we are at liberty to put something into the statute which is not there. Our function, guided by ordinary rules of construction, is to ascertain, if we can, what the legislative intent was and to give effect to it.

In our employment and security law, the legislature did define many of the terms used. § 268.04. It could have likewise easily defined the term "establishment," which we are now called upon to construe. It did not do so. It therefore becomes our duty to determine what meaning the legislature intended to ascribe to the term involved.

In A. H. Phillips, Inc. v. Walling, 324 U. S. 490, 65 S. Ct. 807, 89 L. ed. 1095, 157 A. L. R. 876, *supra,* the United States Supreme Court had under consideration the proper interpretation to be given to the term "retail establishment" under the Fair Labor Standards

---

insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of this state. Involuntary unemployment is therefore a subject of general interest and concern which requires appropriate action by the legislature to prevent its spread and to lighten its burdens. This can be provided by encouraging employers to provide more stable employment and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment, thus maintaining purchasing power and limiting the serious social consequences of poor relief assistance. The legislature, therefor [*sic*], declares that in its considered judgment the public good and the general welfare of the citizens of this state will be promoted by providing, under the police powers of the state for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own."

Act of June 25, 1938.[5] In that case, the petitioner operated a chain of 49 retail stores serviced by a single warehouse. All merchandise was delivered by rail and truck to the warehouse and then delivered to the retail stores as it was needed. The question was whether the warehouse was exempt from the act, the determination of which question depended upon whether the warehouse was a part of the retail establishment. In holding that the warehouse was a separate establishment from the retail stores, the court said (324 U. S. 496, 65 S. Ct. 809, 89 L. ed. 1100) :

"* * * Petitioner claims that its retail stores, warehouse and central office together constitute a 'retail establishment' within the meaning of this exemption. The lack of merit in this claim is obvious. Even if, as petitioner urges, the word 'establishment' referred to an entire business or enterprise, the combined retail-wholesale nature of petitioner's interstate business would prevent it from properly being classified as a local 'retail establishment.' But if, as we believe, Congress used the word 'establishment' as it is normally used in business and in government—as meaning a distinct physical place of business—petitioner's enterprise is composed of 49 retail establishments and a single wholesale establishment."

In the opinion of the circuit court of appeals (1 Cir.) in the above case (144 F. [2d] 102, 105), in commenting on the change in the use of the words separate "establishment" in the passage of the act, the court said:

"* * * Obviously, the word 'establishment' was never meant to mean an entire organization.

"The word 'establishment' in legislative, administrative and commercial practice is treated as meaning a separate unit."

In Walgreen Co. v. Murphy, 386 Ill. 32, 53 N. E. (2d) 390, much the same question was involved in interpreting the Illinois unemployment compensation act. There, the Walgreen Company owned and operated approximately 240 retail stores. It operated a ware-

[5] 52 Stat. 1060, 1067, c. 676, § 13(a)(2), 29 USCA, § 213(a)(2), 9 F. C. A., title 29, § 213(a)(2).

house which supplied the retail stores as well as other independent dealers. The facts differ from those in the instant case, in that the retail stores could continue to operate if the warehouse closed and the warehouse could operate if the retail stores closed. Employes at the warehouse walked out because of a labor dispute. They filed claims under the Illinois unemployment compensation act. Disqualification due to a labor dispute in the Illinois act is similar to the federal act. In holding that the warehouse was a separate establishment, the Illinois court said (386 Ill. 39, 53 N. E. [2d] 394) :

"The words 'establishment' and 'premises,' employed in section 7(d), are so commonly understood as units of place that further definition is superfluous. The words of a statute are to be taken in their ordinary meaning in general and popular use, unless a different meaning was intended, and such meaning must be accepted unless clearly wrong. * * * The words 'establishment, or other premises' are employed in the statute without qualification. In particular, the legislature did not prescribe that an establishment must be essentially different from any other unit of the employer's business. Indeed, the words 'factory, establishment, or other premises' are not modified by the word 'separate.' Nor does section 7(d) declare that there is no work stoppage at any particular 'establishment, or other premises' unless the employer's operations in all their ramifications are completely, if not disastrously affected. Complete geographic isolation, contrary to the determination of the representative of the Director of Labor, is sufficient to justify classification of the warehouse as an establishment. Section 7(d) makes every 'factory, establishment, or other premises' a unit for the purpose of ascertaining whether a stoppage of work due to a labor dispute exists. Here, the warehouse was an 'establishment' or 'other premises' by the mere fact of its location, or 'geographical isolation,' apart from all other establishments and enterprises of the Walgreen company."

Relator relies principally upon Spielmann v. Industrial Comm. 236 Wis. 240, 295 N. W. 1, and Chrysler Corp. v. Smith, 297 Mich. 438, 298 N. W. 87, 135 A. L. R. 900.

In the Spielmann case, it appears that the Nash-Kelvinator Corporation was engaged, among other things, in manufacturing automobiles. It owned plants in Milwaukee, Racine, and Kenosha, Wisconsin. The Milwaukee plant was engaged exclusively in manufacturing bodies for automobiles. The Kenosha plant was devoted exclusively to the manufacture of other parts and to the assembling of the completed cars. Production schedules were carefully worked out in advance, and production was highly synchronized. The two plants were approximately 40 miles apart. The employes of the Kenosha plant went on a strike because of a labor dispute, and this resulted in the closing of the Milwaukee plant. The court upheld the commission in denying unemployment benefits to the employes of the Milwaukee plant, holding that both were part of a single establishment. The Wisconsin statute is for all practical purposes similar to ours.[6] In affirming the industrial commission, the court based its decision, as did the commission, on the ground that the two plants constituted an "establishment" within the meaning of the Wisconsin statute (236 Wis. 243, 295 N. W. 3) "because 'of the physical proximity, functional integrality and general unity' of these plants."

In the Chrysler case the facts were quite similar. The Chrysler Corporation, in manufacturing automobiles, maintains and operates nine essential, coördinated plants in the Detroit, Michigan, area. All the units are within 11 miles of the main plant. A labor dispute in the main plant stopped work in the others. Claims for unemployment compensation were filed under the Michigan act. The disqualifying provisions of the Michigan act follow substantially § 5(d) of the act proposed by the Social Security Board, except that the word "establishment" is used alone instead of the words "factory,

---

[6] Wisconsin Stat. 1939, § 108.04(5)(a), provides:

"An employe who has left (or * * * lost) his employment with an employer because of a strike or other bona fide labor dispute shall not be eligible for benefits from such * * * employer's account for any week in which such strike or other bona fide labor dispute is in active progress in the establishment in which he is or was employed."

establishment, or other premises."[7] The court followed the Spielmann case, holding that the employes were disqualified, two justices dissenting.

In General Motors Corp. v. Mulquin, 134 Conn. 118, 55 A. (2d) 732, the Connecticut court came to the opposite conclusion on facts quite similar to those in the above cases. In that case, the New Departure Division of General Motors Corporation consisted of two industrial plants in Connecticut, one at Bristol and the other at Meriden, 18 miles away. The division is engaged in producing ball bearings, which consist of steel balls, cones, cups, and separators. The Meriden plant is equipped to manufacture only the separators. All other parts are manufactured at the Bristol plant and then go to the Meriden plant, where they are assembled. There is one general manager for the entire division. Purchases are made, with minor exceptions, by the general purchasing agent. Banking practices are quite similar to those in the instant case. There was some difference in the representation of the employes by labor unions, but we do not think that difference is material insofar as the questions here involved are concerned. A strike occurred at the Bristol plant, as a result of which it became necessary to reduce the force at the Meriden plant. That plant continued to operate as long as it could do so. Those laid off filed claims for unemployment compensation benefits. The disqualifying provision in the Connecticut

---

[7] Act No. 1, Pub. Acts 1936 (Ex. Sess.), as amended by Act No. 347, Pub. Acts 1937, and Act No. 324, Pub. Acts 1939, § 29, subd. (d), provides the following disqualification for benefits:

"For any week with respect to which his total or partial unemployment is due to a labor dispute which is actively in progress in the *establishment* in which he is or was last employed: Provided, however, That no individual shall be disqualified under this section if he shall establish that he is not directly involved in such dispute. For the purpose of this section, no individuals shall be deemed to be directly involved in a labor dispute, unless it is established: * * *

"(2) That he is participating in or financing or directly interested in the labor dispute which caused the stoppage of work." (Italics supplied.)

act[8] was similar to § 5(d) of the act proposed by the Social Security Board, *supra,* and to our original act. The employer contended that both plants were part of the same establishment. The unemployment commissioners held that they were not ineligible. The Connecticut court, in holding that the factories were separate, discusses the distinction in the statute between "factory," "establishment," and "other premises." It distinguishes the Spielmann and Chrysler cases and Matson Terminals, Inc. v. California Employment Comm. 24 Cal. (2d) 695, 151 P. (2d) 202, on the difference between the Wisconsin, Michigan, and California statutes and that of Connecticut, but in effect it rejects the reasoning of those cases with respect to the proper interpretation of the meaning of the word "establishment." The court said (134 Conn. 127, 55 A. [2d] 737):

"* * * the word 'establishment' is not to be given the sweeping definition of which it is capable but rather is to be construed in the qualified and restricted sense of being a business or industry other than one conducted in a factory."

Other cases relied upon by relator are not in point. Dept. of Ind. Relations v. Pesnell, 29 Ala. App. 528, 199 So. 720 (affirmed, 240 Ala. 457, 199 So. 726, certiorari denied, 313 U. S. 590, 61 S. Ct. 1113, 85 L. ed. 1545), involved a coal strike. The court, in denying benefits, held that the unemployment was due to acts of the employes'

---

[8]Connecticut Gen. Stat. Supp. 1939, § 1339e(b)(3), provides that an employe shall be ineligible for benefits during any week in which his total or partial unemployment is due to the existence of a labor dispute at the "factory, establishment or other premises" at which he is or has been employed.

The Connecticut case was decided in October 1947. Effective June 9, 1947, the Connecticut general assembly amended its act (Pub. Act 235, 1947 Session, § 16; Supp. to Connecticut Gen. Stat. 1947, c. 280a, § 1391i) to read that an individual shall be ineligible for benefits "during any week in which it shall be found by the administrator that his total or partial unemployment is due to the existence of a labor dispute at the factory, establishment or other premises at which he is or has been employed, *or at a factory, establishment or other premises operated by his employer in the state of Connecticut,* * * *." (Amendment in italics.)

agent, the union, in refusing to permit its members to work pending negotiations for a new contract.

In Baker v. Powhatan Min. Co. 146 Ohio St. 600, 67 N. E. (2d) 714, the factual situation was the same as in the above case. In Local No. 658 v. Brown Shoe Co. 403 Ill. 484, 87 N. E. (2d) 625, a small group of workers in a factory were involved in a strike which caused a stoppage in the whole factory. The questions involved in the instant case were not involved there.

In Unemployment Compensation Comm. v. Aragon, 329 U. S. 143, 67 S. Ct. 245, 91 L. ed. 136, the court held that the mere negotiation of the contract at San Francisco and Seattle did not mean that the dispute could not exist at the Alaskan establishment, where the work was actually done, the case involving a labor dispute in the fisheries industry.

Tucker v. American Smelting & Refining Co. 189 Md. 250, 55 A. (2d) 692, does not help relator. In that case, the company was engaged in smelting and refining copper. It owned a smelter at Garfield, Utah, and a refinery at Baltimore, Maryland, and plants at several other places. The employes at Baltimore, Garfield, and 16 other plants were members of 19 local CIO unions and were represented by those unions as bargaining agents. The members of the local unions were members of one international union. The union attempted to achieve national bargaining, but the employer insisted upon each plant bargaining separately. The employes at the Garfield plant went out on strike, which resulted in a layoff at the Baltimore plant because of lack of work. The Baltimore employes filed claims for benefits. The provisions in the Maryland act disqualifying for stoppages due to a labor dispute follow the language of the act proposed by the Social Security Board, providing that disqualification results from unemployment (189 Md. 252, 55 A. [2d] 693) "due to a stoppage of work which existed because of a labor dispute 'at the factory, establishment, or other premises' at which they were last employed." The lower court held that the two plants were one establishment. In reversing, the court of

appeals of Maryland, distinguishing the Spielmann case, said (189 Md. 256, 55 A. [2d] 694) :

"Comparison with the facts in the Spielmann case shows the absence of evidence that the Garfield and Baltimore plants, because of 'functional integrality,' 'general unity' or 'physical proximity,' constitute a single 'establishment.' Plant managers, or even workmen, may commute forty miles to and fro daily. It would be futile to attempt to fix a precise limit (whether 2000 miles, or more or less) of 'physical proximity.' It is sufficient that in the ordinary use of words a plant at Garfield and one at Baltimore would not be called one 'establishment' and facts are lacking which might give a special and unusual application to the word 'establishment.' Cf. Matson Terminals, Inc., v. California Employment Commission, 24 Cal. 2d 695, 707, 151 P. 2d 202. There is no evidence of more 'functional integration' than there is in the case of any manufacturer who might regularly buy materials and supplies from certain suppliers, e. g., metals from Canada, coal from West Virginia or power from Baltimore. At all events the evidence is sufficient to support the Board's finding that the Garfield and Baltimore plants were not one 'establishment.' "

In Tennessee C. I. & R. Co. v. Martin, 251 Ala. 153, 36 So. (2d) 547, the supreme court of Alabama affirmed the court of appeals (33 Ala. App. 502, 36 So. [2d] 535). The facts were that the company was engaged in the production of steel. In so doing, it operated a steel mill and also owned and operated coal mines, ore mines, and other necessary adjuncts to the manufacture of steel. The steel workers and ore miners went out on strike, causing the coal mines to shut down. No coal was sold to outside users. The court reviewed the Spielmann and Chrysler cases and rejected the test of physical proximity, functional integrality, and unity of management as an absolute rule. The court held that the coal mines were an establishment separate from the steel mills and the ore mines.

Were it necessary to distinguish the Spielmann and Chrysler cases from the case now before us, we believe that there are distinguish-

ing facts. Under the Wisconsin statutes, contributions of employ-ers are apparently kept in separate accounts for each employer, and benefits to employes are charged to that account alone, the state acting merely as a trustee for the employer. In both the Spielmann and Chrysler cases, all the separate factories are located in one state, whereas in our case the strike took place in a factory in one state and the branch involved in this litigation is located in an-other. This distinction is pointed out by Mr. Justice McAllister in his dissenting opinion in the Chrysler case, where he said (297 Mich. 468, 298 N. W. 98):

"Different integrated plants owned by the same corporation may have as employee representatives different bargaining agents, and it is not claimed that the action of a bargaining agent for certain employees can bind other employees employed in a different plant and represented by a different bargaining agent. And *integrated plants owned by the same corporation are often located in different States;* and the employees of such plants may, furthermore, be represented by different bargaining agents. *No contention is made that* integrated plants of different owners in the same State, or *integrated plants owned by the same corporation operating under the laws of different States,* or integrated plants in the same State or different States in which employees are represented by different bargaining agents, *should be considered one establishment within the meaning of the act.* The conclusion, therefore, would seem in-evitable that the provisions of the act in no way contemplate that integration of plants is the sole criterion for the statutory interpre-tation of the word 'establishment'—and that several integrated plants are one establishment while several unintegrated plants are several establishments." (Italics supplied.)

Rather than distinguish the cases on differing facts, we prefer to place decision on the broader ground that we believe that the test of functional integrality, general unity, and physical proximity should not be adopted as an absolute test in all cases of this type. No doubt, these factors are elements that should be taken into con-sideration in determining the ultimate question of whether a factory,

plant, or unit of a larger industry is a separate establishment within the meaning of our employment and security law. However, there are other factors which must also be taken into consideration. The difficulty with attempting to use, as an absolute test, the factors laid down in the Spielmann case comes in its application to the facts of a particular case. Many enterprises have functional integrality between factories which are separately owned. Some are so integrated in part with units or factories having the same ownership and in part with factories or plants which are independently owned. That is the situation which we have in the instant case. Out of some 3,800 or 4,000 parts, about 900 come from the Rouge plant. Some come from other plants owned by the Ford Motor Company, and still others come from plants independently owned. A shutdown caused by a strike or other labor dispute at one of such independent vendors might conceivably cause a shutdown at the St. Paul Ford plant. This did actually happen in 1945, when a strike occurred at the Kelsey Hayes plant. We assume that it is not uncommon that the same international union would represent the employes of several independent plants or factories operating as the Ford plant does with its independent vendors, but we do not believe that anyone would contend that a strike at the plant of such independent vendor would disqualify employes of the Ford plant if it was forced to shut down on account of the lack of parts furnished by such independent vendor.

Proximity is equally unsatisfactory. In order to apply this factor, what distance shall be considered short enough to constitute proximity? Shall the St. Paul branch of the Ford plant be close enough to the Rouge plant and the Georgia or Los Angeles plants, operating in a similar manner, be too far away, or shall any two plants anywhere in the United States be near enough?

Nor is general unity of itself a test. Our statutes recognize that the same employing unit may maintain two or more separate establishments within the state. § 268.04, subd. 9. It might be argued that the legislature had in mind separate establishments which are not related in any way, but the legislature did not so state, and we

do not believe it can be read into the statute. In A. H. Phillips, Inc. v. Walling, 324 U. S. 490, 65 S. Ct. 807, 89 L. ed. 1095, 157 A. L. R. 876, *supra*, there was general unity, but that did not prevent the court from holding that the warehouse was an establishment separate from the retail part of the business.

If, then, these tests standing alone do not suffice, is it a combination of all of them which makes them sufficient? If one is lacking, are the others sufficient, or must they all concur? We believe the better rule to be that these factors, together with other facts, must be taken into consideration in determining whether the unit under consideration is in fact a separate establishment from the standpoint of employment. The St. Paul branch of the Ford Motor Company is highly integrated with other units of the company for purposes of efficient management and operation, but is separate insofar as the employes are concerned for the purpose of employment. The employes are hired and discharged by the St. Paul manager. They are members of a local union which has no connection with the locals at Dearborn, except that all locals are members of the same international, as are many others not connected with the Ford Motor Company. The seniority rights of the employes extend only to operations at the St. Paul plant. No showing has been made, nor do we believe that any can be made, that an employe at the St. Paul branch can "bump" an employe at the Rouge plant, the Los Angeles plant, the Georgia plant, or anywhere else than at the St. Paul plant. Payment to the Minnesota unemployment compensation fund is made only for employes at the St. Paul plant,[9] and, obviously, benefits can be drawn only by employes in the St. Paul branch from the Minnesota fund. Employment under the act relates to services performed within the state or localized here.[10] The members of Local 879 had nothing to do with calling the strike at the Rouge plant and could do nothing to avert it. While the record does not so show, we assume that under our act the contribution rate of the employer is based on the experience

[9]M. S. A. 268.06.
[10]M. S. A. 268.04, subd. 12(2).

ratio of employes within this state without any regard to the experience in other states.

Under § 5(d) of the act proposed by the Social Security Board and under our original act, the unit of employment within which the labor dispute must exist in order to disqualify was designated as the *"factory, establishment, or other premises* at which he is or was last employed." (Italics supplied.) Under our present act, § 268.09, subd. 1(6), the strike or labor dispute must be in progress "at the *establishment* in which he is or was employed." (Italics supplied.) It is doubtful that the change in terminology was intended to enlarge or diminish the unit of employment affecting the disqualification. It has been held that the words "factory, establishment or other premises" in the Alaska act, which is similar to the federal act, were *ejusdem generis* and that the principle of *noscitur a sociis* applies. Aragon v. Unemployment Compensation Comm. (9 Cir.) 149 F. (2d) 447, *supra.*

We are inclined to believe that in our original act the word "establishment" was intended to include those places of employment which could not be classified as a factory; that in the amendment the legislature concluded that the term "establishment" was inclusive of factory and all other types of employer units; and that there was no further need to use the word "factory." For a discussion of the distinction between factory and establishment, see General Motors Corp. v. Mulquin, 134 Conn. 118, 55 A. (2d) 732, *supra.*

The term "establishment" as used in our amended act should be given no broader meaning than it had in the original act, except that it now includes "factory" and "other premises" set out separately in the original act. Our act, patterned after the act proposed by the Social Security Board, is in turn patterned after the British National Insurance Act of 1911 (1 & 2 George V, c. 55, part II, § 87), which was amended in 1935 (25 George V, c. 8, part III, § 26).[11]

---

[11]"(1) An insured contributor who has lost employment by reason of a stoppage of work which was due to a trade dispute at the factory, workshop or other premises at which he was employed shall be disqualified for

Under both the 1911 and the 1935 British acts, disqualification is based upon a work stoppage due to a trade dispute at the *"factory, workshop or other premises"* (italics supplied) at which the claimant is employed. The British umpire, which is the final arbiter under the British act,[12] has consistently held that the words "factory, workshop or other premises" refer to single units of employment. The only substantial change in the language of our original act from the British act was that the word "establishment" was substituted for "workshop." It is difficult to believe that this change was intended to broaden the scope of the employment area so as to encompass a whole industry rather than a single unit of employment.

We believe that the solution of the problem lies in determining from all the facts available whether the unit under consideration is a separate establishment from the standpoint of employment and not whether it is a single enterprise from the standpoint of management or for the more efficient production of goods. If we approach the matter from the standpoint of employment rather than

receiving benefit so long as the stoppage of work continues, except in a case where he has, during the stoppage of work, become bona fide employed elsewhere in the occupation which he usually follows, or has become regularly engaged in some other occupation:

"Provided that this subsection shall not apply in a case where the insured contributor proves—

"(a) that he is not participating in or financing or directly interested in the trade dispute which caused the stoppage of work; and

"(b) that he does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage is taking place, any of whom are participating in or financing or directly interested in the dispute.

"(2) Where separate branches of work which are commonly carried on as separate businesses in separate premises are in any case carried on in separate departments on the same premises, each of those departments shall for the purposes of this section be deemed to be a separate factory or workshop or separate premises, as the case may be."

[12]25 George V, c. 8, part III, § 44(6).

management, there is no difficulty in holding that the director's findings and order are amply sustained by the evidence.

Affirmed.

