## FORD MOTOR CO. v. KENTUCKY UNEM-PLOYMENT COMPENSATION COM-MISSION et al.

Court of Appeals of Kentucky.

Nov. 9, 1951.

Davis, Boehl, Viser & Marcus, Joseph E. Stopher, A. J. Deindoerfer, Louisville, for appellant.

William A. Young, Maurice H. Harris, Frankfort, for appellees.

MILLIKEN, Justice.

This litigation arose out of a strike which occurred at the Dearborn, Michigan, Assembly Plant of the River Rouge group of the Ford Motor Company. The Ford Assembly Plant at Louisville was closed from May 10, 1949, to June 7, 1949, as a result of the Michigan strike. The Ford employees at the Louisville Plant claimed and were paid Unemployment Compensation for that period of time. The real contest at bar is between the Ford Motor Company and the Unemployment Compensation Commission as to how the payments so made are to be charged. The company contends that the payments should have been charged to the Commission's Pooled Account under KRS 341.550 instead of against the Company's Reserve Account under KRS 341.530. The basis of the Company's contention was that its employees were out on a strike, and hence were not entitled to benefits. KRS 341.360(1). The Commission took the view that the Louisville employees of Ford were not on strike, but were forced out of employment by the lack of parts to assemble.

The Ford Motor Company has a number of assembly plants at various points over the country where parts are assembled into the finished product. The Company makes most of the parts which go into its products, and, of course, it sells the assembled finished product through its many retail agencies throughout the nation. Its employment relationships are as coordinated and centralized through a master agreement with a Labor Union as is its production itself.

The employees at the Louisville Assembly Plant were all members of their Local Union No. 862 UAW-CIO as well as the International Union of Automobile Workers. By the terms of the agreement with the International Union, the Local Union could not go out on strike without the consent of the Executive Board of the International Union, and the International Union had the exclusive power to call a general strike with the entire Ford Company. By the terms of the Constitution of the International Union it is clear that that Union has the power to bargain for the employees of the Company no matter where they are located. By the terms of the master agreement between the Company and the International Union it is agreed that the Union is the exclusive bargaining agency relative to rates of pay, wages and conditions of employment for all the employees of the Company and all the production and assembly plants.

The strike began in the Dearborn Assembly Plant over the interpretation of an article in the master contract between the Company and the Union, the details of which it is not necessary to set forth here. To bring the full force of economic pressure against the Company, the Parts Producing Department at River Rouge also went on strike, thus soon leaving the employees at the assembly plants at various places over the country with nothing to assemble. The centralization of bargaining power in the International Union afforded Company employees everywhere certain obvious advantages, but it also afforded management one group with which to deal in the whole industry. One of the questions before us is whether such an arrangement creates any liability in the Louisville Local for the strike at River Rouge.

The purpose of Unemployment Compensation is to mitigate the hardships inherent in the forced unemployment of the worker, but no benefits should be paid to those who are out of employment while "a strike or another bona fide labor dispute which caused him to leave or lose his employment is in active progress in the establishment in which he is or was employed * * *." Were the employees at the Louisville Plant on strike? Was a strike in active progress in the establishment in which they were working within the meaning of our statute, KRS 341.360(1)? As stated in the reply brief of the Company, the basic question is "whether the word 'establishment' as used in Section 341.360(1) of the Kentucky Revised Statutes possesses a connotation sufficiently broad to encompass all those phases of the activity of a corporation

which are completely integrated as to function and general unity, without regard to the fact that different but independent phases of the unified operation may be performed in different plants, and to the fact that such plants be geographically separated." The Commission would like to confine the meaning of the word "establishment" to the physical situs of employment within the employment unit.

A copy of the Constitution of the International Union was filed as an exhibit, and Article 49 thereof clearly leaves the power to initiate a strike with the Local Union except where the International concludes a general strike is necessary. However, before a Local Union may put its voted strike into effect it must obtain the consent of the International or suffer the loss of the financial and organizational support of that body. While the International was recognized as the exclusive collective bargaining agency by the Company with the necessary power to bind the Local Unions, it does not follow that the International Union has the power to call out the Louisville Local to support the Michigan Local in the present situation. In other words, the members of the Louisville Local granted the International Union certain powers of agency and no more. The powers of an agent must be specific or necessarily inferred; they cannot be created carte blanche. Since the Louisville Local took no action to initiate a strike and the International Union did not exercise any power it might have to call it out on strike in this situation, how can it be said that the International was the agent of the Louisville Local as well as all other Locals when it approved or gave its consent to the Michigan strike? The Louisville Local had no power to avert the strike of the Michigan Local. On the basis of this line of reasoning we cannot agree with the decision of the Supreme Court of Georgia in the companion case of Ford Motor Company v. Abercrombie, 207 Ga. 464, 62 S.E. 2d 209, which grew out of this same Michigan strike and where that court concluded that the officers of the International were the authorized agents of the Hopeville, Georgia, Local when they sanctioned the Michigan Local's strike in the parts producing plant at River Rouge.

Since we have decided that the Louisville workers were not directly on strike and had no power to avert the Michigan strike, the next question is whether the far-flung Ford Motor Company is the "establishment" referred to in KRS 341.360 (1) or whether that term refers in this case to the Ford plant at Louisville. The Unemployment Compensation Law is humanitarian in purpose and should be construed in that spirit. By the same reasoning, exceptions to its application should be narrowly construed. Unfortunately, the term "establishment" is not one of the many terms defined in the Act. The Commission points to KRS 341.060(2) where "any employing unit which maintains two or more separate establishments within this state" the workers shall be deemed to be employed by a single employing unit, as indicating that the word "establishment" refers to the physical situs or plant where the work is done, while KRS 341.360 refers to "A strike * * * in active progress in the establishment in which he is or was employed" as disqualifying the worker for compensation. Unless the word "establishment" is construed to include the vast Ford empire, it is contended that the benefits paid the Louisville workers would, in effect, be helping them finance a strike from Company contributions to the Unemployment Compensation Fund. Benefits begin only when income ceases. During this period the maximum allowable was $20 a week for twenty-two weeks, much less than the average worker would have earned. This was a stipend for survival, not a subsidy for a strike. It enabled those who were thrown out of employment by circumstances beyond their control to survive the economic loss. The loss and the hardship are the same whatever their reason.

Many cases have been cited in briefs of counsel both sustaining and denying the Company's contention that the word "establishment" covers the operations of the Company at places other than the source of the claim for benefits. This divergence of judicial views is partially attrib-

utable to the wording of the statutes involved, but the opinions are thoroughly reviewed in Nordling v. Ford Motor Company, 231 Minn. 68, 42 N.W.2d 576, which involved payment of unemployment benefits to workers of the Company at St. Paul who were then out of employment because of the same Michigan strike which caused the loss of work at the Louisville plant of the Company.

Under the Minnesota Act, Section 268.09, M.S.A., the labor dispute had to be in progress "at the establishment in which he is or was employed" as in our Kentucky Act. The opinion comments that [231 Minn. 68, 42 N.W.2d 587]:

"The St. Paul branch of the Ford Motor Company is highly integrated with other units of the company for purposes of efficient management and operation, but is separate insofar as the employes are concerned for the purpose of employment. The employes are hired and discharged by the St. Paul manager. They are members of a local union which has no connection with the locals at Dearborn, except that all locals are members of the same international, as are many others not connected with the Ford Motor Company. The seniority rights of the employes extend only to operations at the St. Paul plant. No showing has been made, nor do we believe that any can be made, that an employe at the St. Paul branch can 'bump' an employe at the Rouge plant, the Los Angeles plant, the Georgia plant, or anywhere else than at the St. Paul plant. Payment to the Minnesota unemployment compensation fund is made only for employes at the St. Paul plant, and, obviously, benefits can be drawn only by employes in the St. Paul branch from the Minnesota fund. Employment under the act relates to services performed within the state or localized here. The members of Local 879 had nothing to do with calling the strike at the Rouge plant and could do nothing to avert it. While the record does not so show, we assume that under our act the contribution rate of the employer is based on the experience ratio of employes within this state without any regard to the experience in other states. * * *

"Our act, patterned after the act proposed by the Social Security Board, is in turn patterned after the British National Insurance Act of 1911 (1 & 2 George V, c. 55, part II, § 87), which was amended in 1935 (25 George V, c. 8, part III, § 26). Under both the 1911 and the 1935 British acts, disqualification is based upon a work stoppage due to a trade dispute at the 'factory, workshop, or other premises' at which the claimant is employed. The British Empire, which is the final arbiter under the British act, has consistently held that the words 'factory, workshop or other premises' refer to single units of employment. The only substantial change in the language of our original act from the British act was that the word 'establishment' was substituted for 'workshop.' It is difficult to believe that this change was intended to broaden the scope of the employment area so as to encompass a whole industry rather than a single unit of employment.

"We believe that the solution of the problem lies in determining from all the facts available whether the unit under consideration is a separate establishment from the standpoint of employment and not whether it is a single enterprise from the standpoint of management or for the more efficient production of goods. If we approach the matter from the standpoint of employment rather than management, there is no difficulty in holding that the director's findings and order are amply sustained by the evidence."

We believe that the reasoning of the Minnesota court is equally applicable to our Act, and for that reason affirm the judgment of the Circuit Court which approved the ruling of the Unemployment Compensation Board.