Karl R. SNOOK, Jr., for himself and for and on behalf of all other employee-claimants of International Harvester Company, similarly situated, Appellants,

v.

INTERNATIONAL HARVESTER COMPANY, Kentucky Unemployment Insurance Commission, et al., Appellees.

Court of Appeals of Kentucky.

March 18, 1955.

Lynville G. Miles, Indianapolis, for appellants.

Ogden, Galphin & Abell, William Abell, Louisville, G. B. Johnson, Christopher Frishe, Frankfort, for appellees.

CLAY, Commissioner.

The question presented is whether or not a certain group of employees of the International Harvester Company, who were "laid off" because of a strike at the Louisville plant (in which they did not directly participate), are entitled to unemployment compensation under the provisions of KRS Chapter 341. The Unemployment Insurance Commission decided against the employees, and this ruling was affirmed on appeal by the Franklin Circuit Court.

The determination of the question requires the construction of the word "establishment" in KRS 341.360. Insofar as pertinent here that statute provides that no worker shall be paid unemployment benefits if:

"A strike or other bona fide labor dispute which caused him to leave or lose his employment is in active progress *in the establishment* in which he is or was employed, * * *." (Our italics.)

Appellants were employed in the foundry of the Louisville plant which produces castings in the manufacture of tractors. In the machine shop of the same plant these castings are machined and the finished tractors assembled. The majority of employees in the foundry and in the machine shop are represented by different labor unions, and consequently operate under different labor contracts.

In the Fall of 1952 the machine shop employees went on strike. In this strike the foundry employees were not directly involved, but as a direct result of it they became temporarily unemployed. If the foundry and the machine shop are different establishments, appellants are entitled to unemployment compensation; otherwise, not.

We cannot improve upon the statement of facts set forth in the opinion of the Unemployment Insurance Commission:

"The company is a manufacturing organization with industrial plants in several states. Within the State of Kentucky, it operates a coal mine at Benham, a sales office in downtown Louisville, and in another section of Louisville an organization known as The Louisville Works for the production of farm equipment, chiefly tractors. From its inception in 1946 until 1949, the Louisville Works consisted of only what now is known as the 'machine shop' which was and still is a plant for the assembling of farm equipment. The parts for assembly were not produced at The Louisville Works. In 1949 the company erected, in close proximity to the 'machine shop,' a building to be used as a foundry for the production of castings of the working part of the tractors assembled in the adjacent machine shop. As of August 1952, sixty-eight per cent of the foundry's production of castings were used by the machine shop at The Louisville Works. The remaining thirty-two per cent of the foundry's castings were sent to the company's machine shops in other states or were sold.

"The foundry and the machine shop are housed in separate buildings which

have separate entrances, although there is a common entrance which can be used. The foundry and the machine shop have separate locker rooms, cafeterias, first aid stations, and time clocks. Prior to the strike hereinafter referred to, about three thousand persons were employed in the machine shop, the great majority of whom are members of the Farm Equipment Workers Union (FE). The remainder of the machine shop employees are members of either the A. F. of L. or the IAM. None of the machine shop employees are the claimants in this case. The fifteen hundred employees in the foundry are members of the United Automobile Workers Union—CIO. All of the claimants herein are foundry employees and members of the UAW-CIO, Local 817.

"Under the provisions of the contract between the UAW-CIO and the company, a foundry employee's seniority rights are determined by his length of unbroken service with the company as a member of the local bargaining unit.

"He may not transfer from the foundry to the machine shop without resigning his foundry job and being hired as a new employee in the machine shop, although an employee in a layoff status could transfer without resigning. His foundry seniority does not follow him into the machine shop; hence, separate seniority lists are maintained for the foundry and the machine shop.

"For the purpose of determining vacation periods, all of an employee's time in the company's employ is considered, regardless of whether it was earned in the foundry or machine shop; however, the amount of vacation earned is computed according to the formula in the UAW contract, if the employee is employed in the foundry at the time of his vacation, or according to the FE contract, if he then is employed in the machine shop; hence separate vacation lists are maintained.

"The foundry and the machine shop each has a superintendent who is responsible to the Works Manager for the operation of his unit. The Works Manager is responsible for the operation of the entire Louisville Works. Assisting and reporting directly to the Works Manager is a staff department which serves both the foundry and the machine shop with respect to purchasing, materials control, accounting, time study, industrial relations, and personnel. All employees of the Louisville Works are hired and fired through the personnel section of this staff department, although personnel records for the foundry and the machine shop are kept separately."

It is evident from the above stated facts that the foundry and the machine shop, from a production standpoint, are closely integrated in the manufacture of tractors. Likewise, from a physical standpoint they are in close proximity, being within one fenced enclosure.

■ It appears the word "establishment" in the statute was used in its ordinarily understood sense and has no special or technical meaning. The term is defined in Webster's New International Dictionary, Second Edition, as:

"The place where one is permanently fixed for residence or business; residence, including grounds, furniture, equipage, retinue, etc., with which one is fitted out; also, an institution or place of business, with its fixtures and organized staff; as, *large* establishment; a *manufacturing* establishment".

Perhaps the most distinctive component of the definition is that an establishment has a fixed geographical "place". To establish something is to fix it immovably. We think the legislature must have had in mind the matter of *location*, particularly since KRS 341.060(2) recognizes that one employing unit may have two or more separate "establishments" within the State of Kentucky.

The only case which has heretofore been before us involving the determination of what constituted an establishment is Ford Motor Co. v. Kentucky Unemployment Compensation Commission, Ky.1951, 243 S.W.2d 657. There the question was whether or not a Ford Assembly plant in Louisville was a separate establishment from the Assembly plant of the same company located in Dearborn, Michigan. The decision was in the affirmative upon the authority of Nordling v. Ford Motor Company, 231 Minn. 68, 42 N.W.2d 576, 28 A.L.R.2d 272, which involved the same factual situation. The decisions in these two cases were that two separate plants or factories located some distance from each other in different states did not constitute a single establishment.

■ As fully discussed in the Minnesota case above cited and in a comprehensive note in 28 A.L.R.2d 287, the issue presented has been approached in other jurisdictions from several standpoints. Among the tests that have been applied in determining whether or not separate plants or activities or functions constitute a single establishment have been those of: (1) functional integration, (2) general unity, and (3) physical proximity. In the Minnesota case, which we followed in the Ford Motor Company case, it was held that no one test was sufficient but that the factors mentioned, together with other facts, must be taken into consideration. The Minnesota court said, at page 89 of 231 Minn., at page 588 of 42 N.W.2d:

"We believe that the solution of the problem lies in determining from all the facts available whether the unit under consideration is a separate establishment from the standpoint of employment and not whether it is a single enterprise from the standpoint of management or for the more efficient production of goods."

If we understand the meaning of this observation, it is that the place and nature of a particular employment are more important than the singleness of management or product. Apparently the Minnesota court did not accept as controlling the "functional integrality" of two separate operations. For cases applying this test see Spielmann v. Industrial Comm., 236 Wis. 240, 295 N.W. 1; and Chrysler Corp. v. Smith, 297 Mich. 438, 298 N.W. 87, 135 A.L.R. 900. It may be pointed out that the Minnesota decision actually stressed the *place* of employment, which was in reality applying the physical proximity test.

Appellants take the position that considering the situation from the standpoint of employment alone, the foundry and machine shop are separate entities because of the *difference* in the type of work, the terms of employment, immediate supervision, and union representation. To follow their argument to its logical conclusion, each *employee* would constitute a separate establishment because he is separately employed, works under different conditions, has a different seniority, etc. The real contention of appellants is in effect that employees represented by different unions constitute different establishments. We can find nothing in our statute or the Minnesota case that would even suggest such a conclusion.

■ It seems to us that whatever test or combination of tests properly should be applied, the foundry and machine shop cannot be considered separate establishments. The two are functionally integrated, there is a general unity both in the operation of the plant and in the nature of employment, and their physical proximity is such as to constitute a single unit. In addition the plant itself, composing both departments, is "a distinct physical place of business". An "establishment" was so defined by the Supreme Court of New Jersey in Ford Motor Co. v. New Jersey Department of Labor, etc., 5 N.J. 494, 76 A.2d 256.

A recent decision of the New York Supreme Court, Appellate Division, involving facts similar to those we have here, seems to us singularly applicable. In Claim of Lasher, 279 App.Div. 505, 111 N.Y.S.2d 356, the Bethlehem Steel Company operated a plant at Lackawanna, New York. In its two Divisions it employed different

types of workers represented by different unions. A strike by the "steel workers" forced the "iron workers" out of employment. The New York statute Labor Law, McK.Consol.Laws, c. 31, § 500 et seq., is similar to ours. In denying the right of the "iron workers" to recover unemployment compensation because of the strike by the "steel workers" the court said, at page 358 of 111 N.Y.S.2d:

"Under the unemployment insurance law adopted in this State, it is of no consequence whatever that claimants were not on strike; that they were not aiding the strike, financially or otherwise; that they were employed in a separate branch of work, or that they lost their employment through no fault of their own. Such elements were significantly omitted by the Legislature when our statute was enacted. * * *

"These claimants were employed by the same employer as the striking steel workers, and were employed at the same plant and upon the identical premises. The work which they were performing was as essential to the production of steel at the plant as the work of the steel workers. The fact that at other times they might be employed elsewhere is of no importance. We must deal with the circumstances existing at the particular time when the unemployment arose. At that time they were clearly employed in the 'establishment' where the industrial controversy arose. To hold otherwise would be tantamount to a holding that employees regularly working at the same plant but in a different department, or doing a different kind of work, or belonging to a different union than striking employees, would not be employed in the same 'establishment.' Clearly this was not the intent of the statute. Clearly the Machcinski case [Machcinski v. Ford Motor Co.], supra, 277 App.Div. [634] 643, 102 N.Y.S.2d [208] 216, does not so hold, but on the contrary expressly says: 'In our opinion we believe the word "establishment" as used in the statute means the place where the employee was last employed.' The undisputed evidence establishes that the industrial controversy occurred 'in the establishment' where claimants were employed."

We do not believe it necessary to discuss the legislative history of KRS 341.-360, which the Company carefully analyzes in its brief. It is pointed out that the General Assembly *rejected* proposed legislation which based disqualification for benefits on *the direct participation* in the strike by the applying employee. Certain it is that more apt language would have been used in the Act if such participation was to be the only limitation upon the right to unemployment compensation. Obviously in using the word "establishment" the legislature envisioned a strike in an integrated physical unit as the key to disqualification rather than the interest of the employee in the labor dispute. Therefore, as noted in the New York opinion just quoted, the strike activities of the employees cannot be the test of qualification for unemployment benefits.

It is contended by appellants that the unemployment compensation statutes were designed to protect those involuntarily thrown out of work, and that they were innocent victims of a situation the legislature intended to ameliorate. In one sense this is true, but on the other hand the legislature may well recognize that unemployment forced by the voluntary acts of fellow laborers is not the type of unemployment for which the employer and the public should pay. The responsibilities of a local labor force are inter-related. Cognizance may be taken that the strike is a common tool of labor, and public policy does not demand that involuntary unemployment resulting from the use of this common tool by a part of the labor force in a particular plant should entitle other employees, whose objectives are fundamentally the same, to receive unemployment compensation. By the use of the word "establishment" we are of the opinion the legislature placed *a localized strike situation* in a category by itself and has not seen fit to declare that

when a strike is in progress at a particular place all non-strikers are entitled to the benefits of the Act.

We are in full agreement with the conclusion reached by the Unemployment Insurance Commission at the close of its excellent opinion, which we quote:

"The foundry and machine shop are in close proximity to each other, enjoy a common boundary, each is easily accessible to the other, and evidently the company has the right to integrate all services of the two groups insofar as permitted by the union contract. These facts lead us to the conclusion that under the test of functional integrality, general unity, physical proximity, and from the standpoint of employment, the machine shop and the foundry are conducted as a single establishment and that the strike in the machine shop was one which was in active progress in the establishment in which the claimants were employed."

The judgment is affirmed.