MERLE CAPRA AND OTHERS v. CARPENTER PAPER
COMPANY AND OTHERS.
FRANK T. STARKEY, COMMISSIONER, DEPARTMENT OF
EMPLOYMENT SECURITY, RESPONDENT.

104 N. W. (2d) 532.

July 22, 1960—No. 37,898.

*Dorsey, Owen, Scott, Barber & Marquart* and *Curtis L. Roy,* for relators.

*Thomas O. Kachelmacher* and *Gerald B. Forrette,* for respondent employees.

*Walter F. Mondale,* Attorney General, and *George C. Gubbins, Jr.,* Special Assistant Attorney General, for respondent commissioner.

*Donald C. Savelkoul,* for Minnesota AFL-CIO Federation of Labor, amicus curiae.

MURPHY, JUSTICE.

Writ of certiorari to review a determination of the Department of Employment Security granting relators' employees unemployment compensation benefits. The facts are relatively undisputed.

Relators are all engaged in the wholesale paper business in Minneapolis. In 1939 they combined under the name of Minneapolis Paper Merchants for the purpose of engaging in collective bargaining. Since 1946 their negotiations have been with Miscellaneous Drivers & Helpers Union, Local 638, the union with which some of the paper merchants' employees are affiliated.[1] Since 1948 Paper Merchants has been represented by a member of the staff of Associated Industries of Minneapolis, a nonprofit corporation assisting employers in their union-management relations. At no time were the individual members of Paper Merchants bound by any agreement which might be negotiated by either Associated or their own organization, though Local 638 has never conducted initial collective bargaining negotiations with any of the employers individually.

After 1948, eight collective bargaining agreements were negotiated by Associated between Paper Merchants and Local 638. While not all of the participating members of Paper Merchants signed all agreements,[2] the nine relators before this court all participated as a group in the negotiations leading to each agreement and are parties to the final

---

[1]Local 638 was chartered in 1946. Formerly negotiations were actually made with General Drivers & Helpers Union, Local 544, A. F. of L., but after 1946 the paper merchants' employees affiliated with Local 544 transferred their membership to Local 638. The pertinent period in this case is after that time.

[2]The individual agreements in the record show that some of the merchants were bound by one or another of the agreements, but not all. The nine relators are, however, in all agreements, and it is clear from the record and determination that they bargained as a group at the time pertinent here.

agreement under which members of Local 638 now work. All eight agreements were concluded without work stoppage.

The 1955-1958 agreement provided for automatic renewal of its terms. It also provided that if either of the parties desired to change, modify, or terminate the agreement, notification of that desire had to be given to the other party. Under that proviso on March 28, 1958, the union notified the paper merchants of its desire to renegotiate the agreement to include new terms more favorable to the employees. After a series of negotiations between the parties and on July 16, 1958, approximately 6 weeks after the 1955-1958 agreement had terminated, the union voted to strike. This decision was participated in by all Local 638 Paper Merchant employees. The union applied for and received strike sanction from the office of the International Teamsters Union.

Paper Merchants then filed a notice of dispute with the state labor conciliator. That notice included the statement that:

"These Employers, for the past several years, have availed themselves of their right under Section 179.10, subdivision 2, of the Minnesota Labor Relations Act, to associate together for the purpose of collective bargaining and each year they have negotiated a single contract covering all of the Companies in the group. Since the Union has filed a strike notice, it becomes necessary in order to maintain our group and to protect any individual company or companies within the group, that we give notice of our intention to discontinue operations under certain conditions.

"It is our intention to discontinue operation, *if, and only if,* the Union strikes at less than all of the Employers in this group. It is filed as a defensive measure only and not for the purpose of forcing upon our employees any particular terms, provisions or conditions of employment."

The notice also stated that it was Paper Merchants' "Intent to lock out." It is clear from the record and from the exhibits that the nine relators would not be bound to lockout as a legal matter. But it is equally clear that the union membership, its officers, and all the merchants understood that should a strike occur at only one of the

merchants' establishments it would bring the retaliatory measure of lockout of all union employees.[3] After a final offer was rejected on September 2, 1958, it was decided by the union membership to strike. The name of Paper Supply Company was drawn from a hat, and on September 3, 1958, that company was struck. It is conceded that the union had no particular grievance against that company. The nine relators before this court then discontinued warehouse operations. It further appears from the record that four other firms were struck for approximately 1 week but they reached an interim settlement with the union pending the settlement of the industry agreement.

Within a matter of a few days from the time when relators stopped operations, each of the claimants before this court applied for unemployment compensation benefits. It should be emphasized that all of claimants are employees of the nine relators. None of the employees of Paper Supply Company applied for benefits. These claims were protested by the merchants on the ground that all claimants were disqualified from receipt of benefits under M. S. A. 268.09, subd. 1(6), and ineligible because not "available for work" as required by § 268.08, subd. 1, nor unemployed as that term is used in § 268.04, subd. 23.

A hearing was held on these issues before an appeal tribunal of the Department of Employment Security. That tribunal found that 28 of the claimants were ineligible for benefits because they had picketed so extensively as to be "unavailable" for work. They found for the claimants on all other issues. These decisions were appealed and the commissioner affirmed the decisions but found, contrary to the holding of the appeal tribunal, that all claimants were available for work and were, therefore, eligible for benefits.

During the period that the strike and cessation of company operations were in progress, all of the firms were picketed extensively. The picketing union members carried signs notifying the public that they were "locked out," and a regular program was instituted by the union whereby pickets were posted at regular hours, though it is asserted

---

[3]The practice of striking employers in a multiemployer group one at a time is known in labor circles as "whipsawing."

that the decision to actually picket was voluntary. During this period also claimants received benefits of $15 per week from the international union after the first week and an additional $10 per week from the local from the beginning of the lockout. These benefits were termed strike benefits by both the international office of the union and the local's own records. Picket duty was not a prerequisite to the payment of these benefits.[4]

The employers' first contention is that the claimants were not unemployed because of a "lockout" within the meaning of § 268.09, subd. 1(6), but were in fact unemployed because of a labor dispute tantamount to a strike and consequently are disqualified from receiving unemployment compensation benefits. In so far as applicable here, that particular section provides:

"An individual shall be disqualified for benefits:

\* \* \* \* \*

"(6) If such individual has left or partially or totally lost his employment with an employer because of a strike or other labor dispute. Such disqualification shall prevail for each week *during which such strike* or other labor dispute *is in progress at the establishment in which he is or was employed,* \* \* \*. For the purpose of this section the term 'labor dispute' shall have the same definition as provided in the Minnesota Labor Relations Act. *Nothing in this subsection shall be deemed to deny benefits to any employee who becomes unemployed because of a lockout* or by dismissal during the period of negotiation in any labor dispute and prior to the commencement of a strike." (Italics supplied.)

The attack of the employers is based upon two phrases in the foregoing

---

[4]There was the following testimony on this point:

"Q. Was there any requirement of these men that they do any picket duty?

"A. No. In fact, we had quite a few during the walkout—on a strike that did not draw picket duty and got their benefits.

"Q. Was there any requirement that they do anything else in the way of work or anything like that?

"A. No."

statute. They contend that the claimants were unemployed "because of a strike or other labor dispute" which was in progress "at the establishment in which he is or was employed." They argue for an interpretation of the statute to the effect that the strike against the Paper Supply Company was in effect a strike against all members of Paper Merchants and that it was, therefore, a strike or labor dispute in progress at the establishments of all of the employers. The interpretation contended for would require that we overrule two decisions of this court in which we considered at length the same points raised by the relators. The first of these is Bucko v. J. F. Quest Foundry Co. 229 Minn. 131, 38 N. W. (2d) 223. The facts in that case are strikingly similar to those in the case before us. Associated Industries was also the bargaining representative for the multiemployer group. There 3 of the 12 members were struck after negotiations had failed to produce a settlement. It was apparently understood that a strike against one employer would be considered by the others to be a strike against all. The 9 other employers then informed their employees that until the dispute was settled the employees would be unable to work. We there held that where employees became unemployed due to a "lockout" they were eligible for unemployment benefits regardless of their participation in a labor dispute which furnished the motive for the lockout.

In Nordling v. Ford Motor Co. 231 Minn. 68, 42 N. W. (2d) 576, 28 A. L. R. (2d) 272, we had before us the narrow question of what is meant by the term "establishment" as used in our statute. There the claimants had been unemployed at a Minnesota automobile assembly plant which was partially shut down because of a strike at a manufacturing plant owned by the employer in Michigan. We held that the question of whether the Minnesota plant was an "establishment" separate from the manufacturing plant, or whether both were parts of the same "establishment," should be determined under all of the facts available from the standpoint of employment rather than of management; that the tests of "functional integrality, general unity, and physical proximity" should not be adopted as absolute but merely as elements to be taken into consideration with other facts; and that, approached from the standpoint of employment, the evidence was ample to sustain the commissioner's finding that the unemployment was not

caused because of a strike or labor dispute at the "establishment" at which the claimant was employed in Minnesota. We are of the view that the word "establishment" as used in the statute must refer to the place or premises where the employee was last employed and cannot have application so as to include within its meaning the plants or premises of employers who may be members of a multiemployer group. If the term "establishment" may not have application to two or more integrated plants operated by the same employer in different states, it should follow that it cannot have application to separate employers who operate separate and independent businesses at separate locations. It is unnecessary to further discuss relators' arguments on this issue other than to observe that the questions raised are fully discussed in the Bucko and Nordling cases. The latter case is considered in an extensive annotation in Annotation, 28 A. L. R. (2d) 287, et seq.

At the core of the relators' argument is the claim that it is not fair to charge its experience-rating account for unemployment compensation benefits received by locked-out employees when the lockout is only to regain the bargaining position the employer enjoys by being a member of a multiemployer bargaining group. They complain that the interpretation which we have given to § 268.09, subd. 1(6), permits the employees to transform the unemployment compensation fund into a strike fund and, therefore, places in the hands of the employees an unfair economic weapon. This argument was fully considered in the Bucko case, and we can only repeat as we did there that, if there is merit to the employers' argument, it presents a question to be debated in the legislature and is not one for judicial determination.[5]

■ The relators next contend that the claimants are ineligible to receive benefits because they were not "unemployed." They suggest a choice of either one of two reasons which might support their contention. They contend that the claimants were self-employed because they were picketing to obtain a wage increase. On the other hand, they argue that the claimants were employed by the union as pickets and paid wages for that service. In considering this argument attention must be directed to § 268.04, subd. 23, which provides:

---

[5]At the last session the legislature failed to pass a bill which would have provided in substance the relief the relators seek here. Senate File 244.

" 'Unemployment'—An individual shall be deemed 'unemployed' in any week during which he performs no service and with respect to which no wages are payable to him, or in any week of less than full time work if the wages payable to him with respect to such week are less than his weekly benefit amount. The commissioner may, in his discretion, prescribe regulations relating to the payment of benefits to such unemployed individuals."

Pursuant to the foregoing statute the commissioner adopted a regulation which provides in part (State of Minnesota, Department of Employment Security, Regulation 20, August 20, 1945):

"(c) No individual shall be deemed to be unemployed in any week in which he

"1. Devotes his full time to the performance of services for an employing unit or is engaged in self-employment regardless of the amount of remuneration paid or payable or earned by him for such services;

"2. Devotes less than his full time to the performance of services for an employing unit or in self-employment for which services a remuneration is paid, payable, or earned in an amount equal to or more than his weekly benefit amount for total unemployment."

By the above-quoted § 268.04, subd. 23, the commissioner is empowered to interpret the meaning of the term "unemployed" as used in the act. The exercise of this power is subject to review only to determine whether, on the record before us, there is a rational basis in law or evidence to support his determination that the strike benefits paid during the term the employees were locked out were not wages. In Bucko v. J. F. Quest Foundry Co. *supra,* we said (229 Minn. 150, 38 N. W. [2d] 234):

"Relator also claims that respondent and the others similarly situated were engaged in self-employment or were performing services for the union subsequent to the time they became unemployed. The question whether or not they remained unemployed so as to be eligible for benefits is not for our determination. The director must administratively determine from time to time whether any person who becomes

unemployed and is entitled to benefits under the act remains eligible. If he procures other employment, he may become ineligible even though he was originally eligible. That is a matter requiring administrative determination from time to time."

While it appears that the claimants as members of a union shared a common responsibility to carry on picketing, we cannot find from the record that they were obligated to engage in picketing if they found other suitable employment. Nor can it be said that the payments they received were "wages" as that term is used in the act. They were paid from funds to which they had contributed. Since the employees were not actually engaged in work other than picketing activities, we cannot say that the commissioner's determination that they were "unemployed" was unreasonable and plainly inconsistent with the act. It is our view that the finding of the commissioner is based on evidence pursuant to authority granted by the legislature. Accordingly, we can go no further in reviewing his decision.[6]

■ The employers' final contention is that all of the claimants who participated in the picketing carried on at the establishment of each employer were not "available for work," a requirement under our statute to be eligible for benefits. The eligibility requirements for unemployment compensation are set forth in § 268.08, subd. 1, which so far as applicable here provides:

"An individual shall be eligible to receive benefits with respect to any week of unemployment only if the commissioner finds that:

*     *     *     *     *

"(3) He was able to work and was available for work, * * *."

The employers point to our decision in Swanson v. Minneapolis-Honeywell Regulator Co. 240 Minn. 449, 61 N. W. (2d) 526, where we said that an individual was not available for work unless he was "accessible or attainable for work when suitable work is offered." They strongly rely on Clinton v. Hake, 185 Tenn. 476, 206 S. W. (2d) 889; Tucker v. American Smelting & Refining Co. 189 Md. 250,

---

[6]Bucko v. J. F. Quest Foundry Co. 229 Minn. 131, 38 N. W. (2d) 223; see, 1 Davis, Administrative Law Treatise, §§ 5.01, 5.03, 5.05; 4 Id. § 30.10.

55 A. (2d) 692; and In re Anderson, 276 App. Div. 804, 93 N. Y. S. (2d) 224. Essentially the employers' argument is that, because the union required picketing, the claimants cannot be said to be unequivocally attached to the labor market. They urge moreover that to be "available for work" means to have the "proper mental attitude." Dwyer v. Unemployment Comp. Comm. 321 Mich. 178, 32 N. W. (2d) 434.

We cannot agree with the claim of the employers that an employee becomes unavailable for work because of the picketing activity. It is true that one cannot picket and be available for work at the same moment. Since an employee may engage in picket duty while awaiting a call to other work, we find nothing inconsistent with the activity of picketing and the status of the claimants in being "available for work." The employers concede that some employees obtained other employment. They make no contention that the claimants were bound to picket even if suitable employment were found for them. At any rate this was a matter for determination by the commissioner. It was his function to determine availability and, so long as there is evidence to support his finding, it will not be disturbed.

In so far as the claim that picketing is inconsistent with being available for work because it does not exhibit the "proper mental attitude," in that the applicant is not receptive to work, we think that the inference is to the contrary. We do not hold that such "attitude" is required under our statute. Picketing by a locked-out employee is one of the obvious means of exhibiting an interest in returning to work. It is one of the methods by which the employee seeks reemployment. The statute is clear with respect to what must be done by the applicant for unemployment compensation—he must register for work, file a claim for benefits, be able to work, be available for work, be unemployed for a waiting period of 1 week during which he is otherwise eligible, and continue to report to the unemployment office each week. There is no requirement that he must be engaged in a search for work for any given number of hours each day or week or that he must contact a certain number of employers to prove that he is engaged in a search for work. The requirement of Minn. St. 1941, § 268.08, as amended by

L. 1943, c. 650, § 4, that a claimant be "actually seeking work" was repealed by the legislature by L. 1945, c. 376, § 5.

Affirmed.