CLAUDE EASTHAGEN AND OTHERS v. NAUGLE-LECK, INC.
FRANK T. STARKEY, COMMISSIONER OF
DEPARTMENT OF EMPLOYMENT
SECURITY, RESPONDENT.

109 N. W. (2d) 556.

May 26, 1961—No. 37,988.

■■■■■■

*Dorsey, Owen, Barber, Marquart & Windhorst* and *Curtis L. Roy,* for relator.

*Walter F. Mondale,* Attorney General, *George C. Gubbins, Jr.,* Special Assistant Attorney General, and *Joseph Coduti,* Assistant Attorney General, for respondent commissioner.

*Goldie, Sigal & Cohen,* for respondent employees.

*Donald C. Savelkoul,* for Minnesota AFL-CIO Federation of Labor, amicus curiae.

THOMAS GALLAGHER, JUSTICE.

Certiorari to review a decision of the Commissioner, Department of Employment Security, which approved findings of the department's appeal tribunal that claimants, Claude Easthagen and 10 other employees of relator, Naugle-Leck, Inc., were not disqualified for benefits chargeable to relator's experience-rating account for being separated from their employment between May 13 and May 25, 1959.

Relator contends that claimants were separated from their work not because of lack of work as the commission found but because of a strike that disqualified them for benefits under Minn. St. 268.09, subd. 1, which provides:

"An individual shall be disqualified for benefits:

\* \* \* \* \*

"(6) If such individual has left or partially or totally lost his employment with an employer because of a strike or other labor dispute. Such disqualification shall prevail for each week during which such strike or other labor dispute is in progress at the establishment in which he is or was employed, \* \* \*."

Relator is engaged in general contracting with its executive offices at 714 Baker Building, Minneapolis. In January 1958 it commenced work as general contractor for construction of the First National Bank

Building in Minneapolis. Claimants were employed therein by relator as bricklayers, laborers, and ironworkers. The plumbing, heating, and air-conditioning contracts for this building had been sublet by relator to B. C. Company, a joint venture comprised of Bjorkman Brothers Plumbing and Heating Company and Commercial Air Conditioning, Inc. Both relator and the latter subcontractors were also engaged in similar construction projects elsewhere in Minneapolis.

On May 4, 1959, a strike was called by all union plumbers in the Twin City area. Its members included a number of plumbers working for B. C. Company on the First National Bank Building, and on that date all such plumbers left their work pursuant to orders from union officials. Their work had been under the supervision of relator's superintendent and was in general interrelated to the work of relator's employees.

Just prior to the strike, these plumbers had been engaged in setting metal sleeves where the concrete for the floors was to be poured, and in installing water, waste, and vent lines where the partitional walls would be constructed. The practice was to have such sleeves and lines in place in sufficient time to permit relator's employees to pour the concrete and construct the walls without being required to chop out holes in the floors or to dislocate walls in the process.

Claimants had been employed by relator in pouring concrete; in setting and laying partition tiles; in laying wire mesh; and in the construction of wood forms for the concrete. After the plumbers left the job, no picket lines were established, and all employees of relator and of other subcontractors continued to report for work. Work continued normally for a number of days, claimants at first pouring concrete and constructing walls, and thereafter being transferred by relator from place to place on the project in an attempt to find work for all employees.

On May 13, 1959, relator ceased operations on the bank building and laid off in excess of 100 of its employees including claimants who thereupon left work until May 25, 1959, at which time relator resumed operations. After operations ceased, claimants filed claims for unemployment compensation benefits under the act. It is not disputed that they were not parties to the strike and had not engaged in any strike

activity during this period; that no labor dispute existed between them and relator; that no picket lines were established at the First National Bank Building; and that claimants did not fail or refuse to work, after the plumbers had left the job, but continued reporting for work until they were "laid off" on May 13, 1959, because relator "ran out of work" for them.

Relator contends that claimants' loss of employment was because of a *work shortage arising out of the plumbers' strike* in progress at the establishment in which they were employed; that the term *establishment* in § 268.09, subd. 1(6), has reference to the physical location or situs of an employee's *work* on the First National Bank Building here; that under § 268.09, subd. 1(6), claimants are disqualified from receiving benefits under c. 268 regardless of the fact that they did not participate in the strike.

Claimants contend that their loss of employment was not because of a *work shortage* due to a strike or labor dispute at the *establishment in which they were employed*—the central or executive offices of relator at 714 Baker Building, Minneapolis.

In its findings and decision, the appeal tribunal stated:

"* * * Where claimants are employed by a separate concern * * * but happen to perform temporary construction work not on their own employer's premises, but in the same area or on the same project as the striking employees, there is no possibility that, without more, their establishment becomes identical with that of the striking employees. The fact that the construction of the bank building was of a temporary nature, and did not provide a permanent place for claimants to work, substantiates the conclusion that where they were employed was instead the physical offices and properties of their employer.

"* * * the conclusion must be that they were separated from their employment for *lack of work, which resulted from the failure of a third party employer to fulfill its obligations*. That separation was involuntary on their part and served as a discharge under the Minnesota Law." (Italics supplied.)

■ The legislative intent in enacting c. 268 relating to employment security may be ascertained from § 268.03, which provides in part:

"* * * The legislature, therefore, declares that in its considered judgment the public good and the general welfare of the citizens of this state will be promoted by providing, under the police powers of the state for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own."

With this basic concept in mind, this court has held that the purpose of the act is to assist those who are unfortunate enough to be involuntarily unemployed, Di Re v. Central Livestock Order Buying Co. 246 Minn. 279, 74 N. W. (2d) 518; that the act's design is to relieve hardship caused by unemployment due to no fault of an employee, Anson v. Fisher Amusement Corp. 254 Minn. 93, 93 N. W. (2d) 815; Nordling v. Ford Motor Co. 231 Minn. 68, 42 N. W. (2d) 576, 28 A. L. R. (2d) 272; that the provisions of § 268.09, subd. 1(6), relating to disqualifications should be construed in line with the legislative intent expressed in § 268.03, Bucko v. J. F. Quest Foundry Co. 229 Minn. 131, 38 N. W. (2d) 223; and that whether an employee's loss of employment is voluntary or involuntary should be determined by whether the *employee* exercised a free-will choice and control in the matter, Hessler v. American Television & Radio Co. 258 Minn. 541, 104 N. W. (2d) 876.

■  Applying these same concepts to the construction of § 268.09, subd. 1(6), we have upheld certain employees' qualifications for benefits where loss of employment was due to a local work shortage caused by a strike at an out-of-state assembly plant of their employer, Nordling v. Ford Motor Co. *supra;* where loss of employment was due to the closing of retail bakery outlets because a strike by another group of employees threatened to close the supermarkets in which the bakery outlets were tenants, Koll v. Egekvist Bakeries, Inc. 259 Minn. 287, 107 N. W. (2d) 373; and where loss of employment in certain foundries was due to a strike in other foundries, which had caused the former to be closed pursuant to an agreement of the owners of both groups to act in unison in case of a strike, Bucko v. J. F. Quest Foundry Co. *supra;* see, also, Capra v. Carpenter Paper Co. 258 Minn. 456, 104 N. W. (2d) 532.

■ The commission determined here that the strike which involved a few employees on the bank project on which claimants were presently working was not in progress at and did not relate to the *establishment at which they were employed.* This, it determined, *was relator's central or executive offices in the Baker Building in Minneapolis* where it conducted all business affairs relating to its various building projects in the area including the one to which claimants had been assigned and at which they were working when the plumbers' strike began. A number of factors lead us to the conclusion that the commission correctly construed § 268.09, subd. 1(6).

The strike and the departure of a number of plumbers from the bank project did not compel the claimants or other employees there to quit their employment. Nor was there any coercion by or sympathy for the strikers which brought about this result. No picket lines were established. The bank project was but one of many construction jobs from which the plumbers left their work. Can it be said that each of these many construction projects in the Twin City area constituted the "establishment" at which the strike or labor dispute was in progress? Rather, it would seem more in line with logic and legislative policy as expressed in the act to hold that the central office of each of the various plumbing contractors whose employees were on strike constituted the "establishment" referred to in § 268.09, subd. 1(6).

■ This case is one of first impression here, but where similar disqualification statutes of other states have been construed, the courts have reached like conclusions. Thus, in Matter of Bucklaew, 277 App. Div. 805, 96 N. Y. S. (2d) 875, the New York court held that an electrician who had been in the employ of an electrical contractor was not disqualified for benefits where his loss of employment was due to a work shortage caused by a strike of employees of another craft working for another employer on the same project to which the electrician had been assigned for work. See, also, Matter of Wittlaufer, 277 App. Div. 805, 96 N. Y. S. (2d) 877; Matter of Freeman, 9 App. Div. (2d) 1008, 195 N. Y. S. (2d) 62. In Murray v. Appeal Board, CCH, Unemployment Ins. Rep. Transfer Binder, Mich. Rulings and Decisions (1952-1956), par. 8495, p. 25,928, the Wayne County Circuit Court arrived at a like conclusion. There, claimants, employees of a

fireproofing company, were working on various housing projects in the Detroit area. Because of a carpenters' strike in progress in the Detroit area with a resulting work shortage, claimants were notified that there would be no further work for them until such strike was settled. In holding claimants' loss of employment did not disqualify them for benefits under the provision of the Michigan disqualification statute, Mich. Stat. Ann. § 17.531, subd. 1(b), similar to § 268.09, subd. 1(6), the court stated (p. 25,933):

"* * * the argument for disqualification * * * would have to presuppose a widening of the definition of 'establishment' to include five widely-separated construction projects upon which this employer's building tradesmen were working. That there was a labor dispute which occasioned a stoppage of work on these projects is beyond discussion. It would take a strained and unusual interpretation of the word to hold that these five building projects constituted in any sense 'the establishment' of the * * * Fireproofing Company."

In the instant case it is clear that claimants' loss of employment was without fault on their part; and under our construction of § 268.09, subd. 1(6), that it was not due to a strike or labor dispute in progress at the *establishment where they were employed*. It is true also that relator had no choice but to suspend operations because a city-wide strike of employees of another contractor brought about a work shortage for its employees. However, even though relator was without fault in the situation, effect must be given to the public policy involved in the enactment of c. 268, as expressed in § 268.03, that the act is designed for the benefit of those employees covered by its terms who become unemployed through no fault of their own.

Affirmed.

KNUTSON, JUSTICE (concurring specially).

I concur in the result. The decisive question in this case is whether the work stoppage was due to a labor dispute existing at the establishment at which claimants were employed. I think that it should be said that in defining "establishment," as used in unemployment compensation statutes, the term must be given a broad enough meaning to effectuate the purposes of the act. Obviously, the criteria used to de-

fine the term cannot be made all-inclusive so as to govern all cases regardless of what the facts are. In defining the term we cannot ignore the employment unit of which the claimants are a part. We are here dealing with employees engaged in a type of work where they have no fixed permanent situs of employment. They may be employed on one building job one day and another on another day. In addition, employees of many employers may be engaged on the same premises. It cannot be said that they are all working at the same establishment merely because they are working on the same premises. While the locale of the work may be of great importance when employees have a fixed situs, it may be of little significance in cases where the employment is of a transitory nature.

In Nordling v. Ford Motor Co. 231 Minn. 68, 42 N. W. (2d) 576, 28 A. L. R. (2d) 272, relied upon to some extent by both parties, we were dealing with a case in which the employment was at a fixed location. What was said in that case may not be applied without qualification to facts which are not at all similar to those involved there. In a case such as we have here, "establishment" must encompass the employment unit as distinguished from the place where the employees may be temporarily engaged in doing their work. Neither is it satisfactory to limit the definition of the word "establishment" to the central or executive offices of the employer. While definition of "establishment" in a case such as this may involve the use of a nebulous concept of employment unit, it must encompass the employees of an employer, no matter where they happen to be working for the time being, and cannot be limited to a particular place where they happen to be working temporarily. If we consider "establishment" in the light of the employment unit of which the claimants are a part rather than the premises on which they happen to be temporarily employed, there is no difficulty in holding that the unemployment here was not due to a labor dispute existing at such establishment.

DELL, CHIEF JUSTICE (concurring specially).

I join with Mr. Justice Knutson in the foregoing concurring opinion.

MR. JUSTICE OTIS, not having been a member of the court at the time of the argument and submission, took no part in the consideration or decision of this case.