ROGER ADELSMAN AND OTHERS v. NORTHWEST AIRLINES, INC.
FRANK T. STARKEY, COMMISSIONER, DEPARTMENT OF EMPLOYMENT SECURITY, RESPONDENT.

125 N. W. (2d) 444.

December 13, 1963—No. 38,865.

Dorsey, Owen, Marquart, Windhorst & West, Henry Halladay, and John D. Levine, for relator.

Lindquist, Magnuson & Glennon, Richard E. Wetherall, Peterson, Bell & Converse, and Erwin A. Peterson, for respondent employees.

Walter F. Mondale, Attorney General, and Joseph A. Coduti, Assistant Attorney General, for respondent commissioner.

KNUTSON, CHIEF JUSTICE.

Certiorari to review a decision of the commissioner of the Department of Employment Security awarding benefits to some 270 employees of relator.

The claim of relator is that all claimants were disqualified from benefits because their unemployment was due to a strike or labor dispute in progress at the establishment in which they were employed within the meaning of Minn. St. 268.09, subd. 1(6).

Many of the findings of the appeal tribunal, which were substantially adopted and affirmed by the commissioner, are not in dispute. So far as they are necessary to an understanding of the issues governing this decision, they will be adopted if unchallenged.

Employer, Northwest Airlines, Inc., is a certificated common carrier of passengers, mail, and cargo by air. Its entire transportation system covers approximately 18,000 route miles and serves about 35 cities in the continental United States and about 7 cities in the Orient and Hawaii. As a common carrier by air, employer is subject to the rules and regulations prescribed by the Civil Aeronautics Board and the Federal Aviation Agency.[1] The employment relations between employer

---

[1] See, 49 USCA, §§ 1301 to 1542.

and its employees are regulated by the Railway Labor Act, 45 USCA, § 151, and following sections, except § 153, which is not applicable to common carriers by air.

Employer's principal general offices are located in St. Paul, where most of its operations are controlled and directed. The largest base of operations is located at Wold Chamberlain Airfield in Minneapolis.

Flight crews based at employer's main base of operations in the St. Paul-Minneapolis area operate employer's planes over the following main flight routes: From Minneapolis to New York City, then to Detroit, Cleveland, Washington, D. C., Miami, and return to Minneapolis. From Minneapolis to Milwaukee, then to Chicago, Miami, and return to Minneapolis. From Minneapolis to Seattle and return to Minneapolis.

Employer's second largest base of operations is at Seattle, Washington, where it has its western flight region administrative offices, airplane hangars, maintenance and repair shops, service stations, and other installations. Stationed at the Seattle base are a manager and assistant manager of base operations, personnel supervisor, manager of the western flight region, and other supervisory personnel and employees of various classifications, making up a total of about 800 employees.

Flight crews based at employer's second largest base at Seattle operate employer's airplanes over the following main routes: From Seattle to Chicago, New York, and return to Seattle, bypassing the Twin Cities. From Seattle to Anchorage, Alaska; then to Tokyo, Japan; Taipeh, Formosa; Manila, Philippine Islands; Hongkong, China; Seoul, Korea; and return to Seattle. From Seattle to Honolulu, and return to Seattle. From Seattle to Portland, Oregon, then to Honolulu, and return to Seattle.

The western flight region's jurisdiction with respect to employees whose services are localized extends eastward from Seattle to Billings, Montana. However, its jurisdiction over flight crews based at Seattle continues from Seattle to the destination of the airplanes flown and the return to Seattle.

Employer operates other important airplane bases located in New

York City, Chicago, Miami, Portland, Spokane, Anchorage, Tokyo, and Honolulu.

The employer operates airplanes out of its base of operations in New York City over the following main flight routes: From New York City to Minneapolis; then to Edmonton, Canada; Anchorage, Alaska; and return to New York City. From New York City to Chicago, Seattle, Portland, and return to New York City. From New York City to Miami, return to New York City, then to Chicago, Minneapolis, Portland, and return to New York City.

In addition to its main flight routes, employer operates planes over various short-distance, feeder routes to and from stations on the main routes. Employer also operates a number of way stations along its main flight routes, where its long-distance planes stop and pick up passengers, many of whom are brought to such stations by feeder planes from other points. These way stations are staffed by service, maintenance, and ticket sales personnel.

Employer has several collective-bargaining agreements with a number of unions. Agreements representing the flight engineers, instructors, production planners, service engineers, technical manual writers and service analysts, plant protection men, mechanics and related personnel, and supervisors of mechanical personnel, and an agreement covering flight kitchen personnel have been entered with International Association of Machinists, Northwest District Lodge No. 143, referred to as IAM.

It also has collective-bargaining agreements with the Air Line Pilots Association International (ALPA), representing airline pilots and co-pilots; with Transport Workers Union of America, AFL-CIO (TWUA), representing airline navigators; with Airline Stewards and Stewardesses Association, International (ALSSAI), representing flight pursers, flight service attendants, and stewardesses; with Air Line Dispatchers Association, representing dispatchers; with Air Line Communication Employees Association, Unaffiliated (ALCEAU), representing airline radio operators and airline teletype operators; with Air Line Agents Association, International (ALAAI), representing Link Trainer operators; with Society of Airline Meteorologists (SALM), representing

meteorologists; and with Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees, representing clerical, office, fleet, and passenger service employees.

For some time prior to July 1959 employer had been using planes designated as Douglas DC-4, DC-6, DC-7, and Boeing Strato-Cruiser airplanes, all of which are piston-driven, propeller-type aircraft. The DC-4 planes were used on short-range flights, both in the continental United States and in the Orient. The DC-6s and DC-7s were used on long-range, transcontinental and transpacific flights. The Strato-Cruisers were used on long-distance, transcontinental flights. In March 1959, employer acquired 5 new Lockheed-188 Turbo-jet Electra planes, and in July 1959 it acquired 5 additional L-188 Electra planes. The L-188 Electras were based at Minneapolis and were used principally on flights to Chicago, New York, Miami, and return to Minneapolis, and on flights from Minneapolis to Seattle and return. In February 1961, employer had 18 L-188 Electra planes. The Electra is a large, fast, long-distance, propeller-type airplane, distinguished from the DC planes by the fact that it is known as a turbo-jet. It is operated by a turbine-type engine.

Prior to the acquisition of the Electra planes, all airplane repair work, including engine overhaul jobs, was performed at employer's own shops and by its own employees.

The appeal tribunal found that on or about March 17, 1960, one of employer's L-188 Electras was lost in an accident and sometime during the latter part of April 1960 employer leased from the Lockheed company 5 of the Boeing Strato-Cruisers which it had previously traded in as part of the payment on the 10 L-188 Electra planes.

On July 1, 1960, employer had in operation the following planes: 12 DC-4s; 23 DC-6s; 17 DC-7s; 5 B-377 Strato-Cruisers; and 9 L-188 Electras, or a total of 66 planes. On May 11, 1960, employer received delivery of the first of its Douglas DC-8 planes, which is a straight jet airplane, and on July 1, August 5, and September 22 it received delivery of 3 additional DC-8 planes, making a total of 4 of such straight jet planes then on hand. These planes were all assigned to employer's base of operations at Seattle and were put in revenue

service on July 12, July 29, and August 31, 1960. The plane received on September 22, 1960, was first given the necessary shakedown cruises and then used temporarily for training flights. The fifth DC-8 plane was received sometime later, and a Boeing 720 straight jet airplane was received early in 1961.

The crew complement of a DC-8 consists of a pilot, copilot, flight engineer, and from two to three cabin attendants. On transpacific flights, a navigator is also assigned to the plane. By comparison, the crew assigned to the L-188 Electras consists of a pilot, copilot, flight engineer, two cabin attendants, and no navigator.

Negotiations for a new collective-bargaining agreement relative to the wages and other conditions of employment of the flight engineers continued throughout the summer of 1960. On October 11, negotiations reached an impasse, and the chairman of IAM sent a telegram to employer's vice president in charge of personnel informing him that the flight engineers were withdrawing their services on DC-8 planes in revenue service. On the same date, 20 trained and qualified engineers at employer's base of operations and establishment at Seattle were requested by employer to serve on DC-8 planes in revenue service, which they refused to do. Being unable to procure flight engineers, which were required by Federal regulation on this type of plane, the DC-8s were effectively grounded. Thereafter, between October 11, 1960, and December 30, 1960, employer laid off some 1,200 employees, about 631 of whom, including all of the claimants herein, were employed at the headquarters in St. Paul and Minneapolis.

On January 9, 1961, a more general strike occurred, so this case involves only the right of claimants to compensation between October 11, 1960, and January 9, 1961.

It is the contention of employer that all 1,200 employees were laid off as a result of the strike of 20 flight engineers, which caused a grounding of the DC-8s. The appeal tribunal and commissioner found that the claimants were laid off as a result of causes unrelated to the labor dispute, primarily the following:

"* * * (1) the adverse effects of the economic recession which all parties agree occurred throughout the year 1960 and was still in prog-

ress at the time of hearing herein; (2) the change-over from piston-powered, propeller-driven aircraft to straight-jet-powered, thrust-driven aircraft; (3) the severe competition presented by other airlines which were and had for some time been using straight-jet aircraft on long-distance, trans-continental and trans-pacific flights, and (4) the adverse effect upon passenger travel by airplane caused by the crashing of several airplanes during the last half of 1959 and the year 1960, including one of the employer's Electra planes at Tell City, Indiana on or about March 17, 1960, resulting in the loss of many lives."

The statutory provision governing the rights of the parties is found in § 268.09, subd. 1, which, as far as material here, reads:

"An individual shall be disqualified for benefits:

\* \* \* \* \*

"(6) If such individual has left or partially or totally lost his employment with an employer because of a strike or other labor dispute. Such disqualification shall prevail for each week during which such strike or other labor dispute is in progress at the establishment in which he is or was employed \* \* \*. For the purpose of this section the term 'labor dispute' shall have the same definition as provided in the Minnesota Labor Relations Act. Nothing in this subsection shall be deemed to deny benefits to any employee who becomes unemployed because of a lockout or by dismissal during the period of negotiation in any labor dispute and prior to the commencement of a strike."

Although employer assigns many errors, the decisive questions boil down to a determination of two basic issues: (1) Did the claimants lose their employment as the result of a strike or labor dispute? (2) If so, was such labor dispute in progress at the establishment at which they were employed?

The nature and purpose of our unemployment laws have been adequately stated in prior decisions.[2]

---

[2]Bucko v. J. F. Quest Foundry Co. 229 Minn. 131, 38 N. W. (2d) 223; Di Re v. Central Livestock Order Buying Co. 246 Minn. 279, 74 N. W. (2d) 518; Anson v. Fisher Amusement Corp. 254 Minn. 93, 93 N. W. (2d) 815.

In Nordling v. Ford Motor Co. 231 Minn. 68, 76, 42 N. W. (2d) 576, 581, 28 A. L. R. (2d) 272, 279, we said:

"Unemployment compensation statutes were enacted during a period of distress and were designed to relieve the hardship caused by unemployment due to no fault of the employe. The legislative purpose behind the enactment of our act is to be found in the legislative declaration of public policy, § 268.03. It is a general rule that a liberal construction is usually accorded statutes which are regarded by courts as humanitarian or which are grounded on a humane public policy. [Citations omitted.] Where there are disqualifying provisions, the exceptions should be narrowly construed. But these rules of construction do not mean that we are at liberty to put something into the statute which is not there. Our function, guided by ordinary rules of construction, is to ascertain, if we can, what the legislative intent was and to give effect to it."

■ Upon proof of facts of eligibility due to unemployment, compensation follows unless there is proof of disqualification.

■ Where disqualification is claimed, the employer has the burden of proving the requisite facts to bring the employee within the statutory deprivation of benefits.[3]

■ To bring the employees here within the statutory disqualification, two essential facts must be established, namely, (1) that the employee "has left or partially or totally lost his employment * * * *because of a strike or other labor dispute,"* and, if so, (2) that "such strike or other labor dispute is in progress at the establishment in which he is or was employed." (Italics supplied.)

It is apparent that failure of proof of either fact entitles the employee to compensation.

■ Attempts to define the term "establishment" has given rise to much difficulty here and elsewhere. We have had occasion to construe the provisions in a variety of cases involving facts that are seldom the

---

[3]Dalton Brick & Tile Co. v. Huiet, 102 Ga. App. 221, 115 S. E. (2d) 748.

same or similar.[4] Courts elsewhere have had the same difficulty.[5]

It now seems quite clear that no rule of thumb is available that can be applied arbitrarily to the facts of all cases for the reason that the facts seldom are the same or similar.

In the Nordling case we said (231 Minn. 89, 42 N. W. [2d] 588, 28 A. L. R. [2d] 287):

"We believe that the solution of the problem lies in determining from all the facts available whether the unit under consideration is a separate establishment from the standpoint of employment and not whether it is a single enterprise from the standpoint of management or for the more efficient production of goods."[6]

Each case must be determined on its own facts, applying such tests as are available to determine whether, as to the particular employees involved, the strike or labor dispute is in progress at the establishment giving rise to their employment and whether such strike or labor dispute is causally related to the unemployment. It is even conceivable that in an enterprise as far flung as the one we now have under consideration the entire enterprise might constitute one establishment for employees such as pilots, who had no fixed terminus and who were controlled from the central control center, but might not constitute a

---

[4]Bucko v. J. F. Quest Foundry Co. 229 Minn. 131, 38 N. W. (2d) 223; Nordling v. Ford Motor Co. 231 Minn. 68, 42 N. W. (2d) 576, 28 A. L. R. (2d) 272; Capra v. Carpenter Paper Co. 258 Minn. 456, 104 N. W. (2d) 532; Koll v. Egekvist Bakeries, Inc. 259 Minn. 287, 107 N. W. (2d) 373; Weiss v. Klein Super Markets, Inc. 259 Minn. 502, 108 N. W. (2d) 4; Easthagen v. Naugle-Leck, Inc. 260 Minn. 198, 109 N. W. (2d) 556.

[5]See, Annotation, 28 A. L. R. (2d) 287, 324; Ford Motor Co. v. Abercrombie, 207 Ga. 464, 62 S. E. (2d) 209; Ford Motor Co. v. Kentucky Unemployment Comp. Comm. (Ky.) 243 S. W. (2d) 657; Ford Motor Co. v. Director of Division of Employment Security, 326 Mass. 757, 96 N. E. (2d) 859; Ford Motor Co. v. New Jersey Dept. of Labor & Industry, 5 N. J. 494, 76 A. (2d) 256; In re Machcinski, 277 App. Div. 634, 102 N. Y. S. (2d) 208; Ford Motor Co. v. Unemployment Comp. Board, 168 Pa. Super. 446, 79 A. (2d) 121; Ford Motor Co. v. Unemployment Comp. Comm. 191 Va. 812, 63 S. E. (2d) 28.

[6]See, concurring opinion, Easthagen v. Naugle-Leck, Inc. *supra.*

single establishment for a smaller segment of the employees whose connection with the enterprise was entirely localized. In these days of rapid increase in speed in transportation, in construing the term "proximity" for instance, which is commonly used as an element in determining whether the separated units of a whole enterprise are all one establishment,[7] the time it takes to go from one place to another must be given consideration as well as the actual distance.

But in this case we need not determine whether the entire enterprise of employer constituted a single enterprise or not. After reviewing a voluminous record of over 1,300 pages, with no attempt made to reduce it in size, we are convinced that implicit in the findings of the commissioner that the unemployment of these claimants was not due to a strike or labor dispute is a determination that employer has failed to establish the requisite facts of disqualification and that the commissioner's findings are supported by the evidence.

■ Our scope of review in a matter of this kind is quite limited. We have frequently discussed how far we can go.[8]

■ As has been noted above, the commissioner found that the unemployment of claimants was due to other factors than a strike or labor dispute.

It is quite apparent from the record that a strike of 20 flight engineers who were required on the DC-8s effectively grounded those planes. They were the only qualified personnel for such a position. The law required their presence in the operation of this type of plane. It is equally obvious that the grounding of the DC-8s caused a substantial loss in the income of employer. But even accepting those facts, it does not follow that employer could not have continued to operate on a more limited scale with the balance of its equipment or that all individuals claiming benefits were connected with the opera-

---

[7]See, for instance, Nordling v. Ford Motor Co. *supra.*

[8]See, Bucko v. J. F. Quest Foundry Co. 229 Minn. 131, 38 N. W. (2d) 223; State ex rel. Dybdal v. State Securities Comm. 145 Minn. 221, 176 N. W. 759; Bowman v. Troy Launderers & Cleaners, Inc. 215 Minn. 226, 9 N. W. (2d) 506; Nyberg v. R. N. Cardozo & Brother, Inc. 243 Minn. 361, 67 N. W. (2d) 821.

tion of the DC-8s in such a way that their unemployment had a causal relationship to the strike or labor dispute. No attempt has been made to segregate the employment of one claimant from the others. In this proceeding, they are all handled on a basis of all or none being entitled to compensation. To justify disqualification on that basis, it must appear that the unemployment of all of them had a causal relationship to the strike or labor dispute.

It would unduly lengthen this opinion to discuss in detail the evidence contained in this voluminous record. It is enough to briefly state some of the relevant evidence that supports the findings of the commissioner.

Bearing on the commissioner's findings that the layoff of claimants and others was due to the economic recession, we find testimony in the record of Ronald K. Carlson, director of employment for relator, that 355 employees had been laid off prior to October 11, 1960, because of the general economic situation which began in 1960 and which required schedule adjustments to be made. The number of passengers had been reduced in the period before October 11 because of this economic situation. There is evidence that the recession had leveled off about in July 1960 and that the drop in the number of employees had occurred before that time, but there is also testimony by Carlson that the decline in business continued throughout the year 1960 and even up to the time of trial. He testified that 15 flight engineers had been laid off effective October 7, 1960, at a time when he claims that the effects of the recession were over, because of a change in the scheduling pattern of the flights of employer's planes. We quote part of his testimony as follows:

"Q. It is true is it not, Mr. Carlson, that the decline in economic conditions in June, July, 1960, continued on throughout the entire year of 1960 and even into 1961?

"Mr. Carlson:

"A. Yes. My recollection is that there was a decline in the spring and summer of 1960, and there was a general leveling off—there was no improvement in business until—well, right now we are getting into what they call, I guess, the up-swing.

"Q. Well, the decline in business during that period even continues to—continues now to some extent as a matter of common knowledge isn't it?

"A. Yes, that's correct, and I assume that—

"Q. And I assume that it affected the airplane industry too?

"A. That's right.

"Q. It existed all through 1960?

"A. That's right.

"Q. And even continued into 1961, and as a matter of fact some authorities say it is just leveling off—we aren't out of the woods yet?

"A. Yes, aren't out of the woods yet. That's right, but they are starting to be hopeful about next month or next week or something like that.

"Q. The economic conditions there in June or July are what caused those layoffs at that time, is that right?

"A. That's right.

"Q. And economic conditions continued to drop for some time thereafter, isn't that true?

"A. I would say that after that period there was—my recollection —there was more of a leveling off. It was not—the drop had occurred by that time."

It is true that there is evidence showing that the operator's revenue in September and early October was up from the preceding year until the strike occurred on October 11. However, there is much evidence in the record from which the commissioner could conclude that at least part of the layoff was due to the economic recession rather than to the strike.

With respect to the finding that the layoffs were due to the change from the propeller-driven, piston-powered planes to jets, we find ample evidence to justify the inference that it requires fewer crews to fly the larger, faster jet planes to carry the same number of passengers per seat mile[9] than was required to fly the slower and smaller propel-ler-driven planes. Immediately prior to October 11, 1960, employer

---

[9]A seat mile is defined in the record as one seat occupied by one passenger for one mile while the plane is in flight.

contemplated using 10 planes less than it thought it would use in February 1960. On October 11, 1960, when the strike began, the company was using 62 planes, but at the time of the trial it was using only 50. Shortly before October 1960, 36 pilots were laid off. In all, 355 persons were laid off during the period when the DC-8s were obtained up to the time of the strike. The record shows that it was estimated that 520 pilots would be needed in the first 6 months of 1961, while the estimate for 1960 was 585 pilots. There is also ample evidence to show that much of the work in maintaining and repairing the engines on the DC-8s was transferred to independent companies and was not to be performed by relator's employees.

With respect to the effect of the crashes which occurred with the Electras, about all that need be said is that the effect of these crashes is highly speculative. However, we need go no further to demonstrate that there is ample evidence to sustain the commissioner's findings in at least one or two of the factors to which it attributes the layoff of at least some of the employees who have made claims for benefits.

It may well be that the unemployment of some 1,200 employees laid off after October 11 was due to a calculated business decision of employer that it would be advantageous to shut down a major portion of the business temporarily rather than to operate without the DC-8s. However, from a reading of the record, it is hardly conceivable that all 1,200 people laid off were connected directly or indirectly with the operation of the DC-8 planes. Until the more general strike occurred in January 1961, there appears to have been no compelling reason why the operation of the DC-8s would require the employment of all those laid off. No attempt has been made to show that all 270 claimants or a part of them, if any, were directly or indirectly unemployed as a result of the grounding of the DC-8s, aside from the flight engineers and pilots on the DC-8s, who are not involved here. It is only by applying the rule of seniority, under which personnel having a longer period of service could "bump" those having less service and ultimately reach a point where someone lost his job, that it can be assumed at all that any of the claimants were unemployed indirectly as a result of the strike. To hold that all these people, without any further showing, are disqualified as a result of this strike would be stretching the disquali-

fication entirely too far. It appears more likely that in contemplation of the adoption of larger and faster type planes, which obviously was in the offing, the grounding of the DC-8s offered employer an opportunity to lay off a large number of people in order to permit a future readjustment in its operating personnel in view of the foreseeable need for less people to operate and maintain the larger and faster planes. At least there is ample evidence to sustain the commissioner's findings that such was the case.

In view of the fact that we find support for the findings of the commissioner, it follows that employer has failed to establish the statutory disqualification. An affirmance must follow.

Affirmed.